**RILEY ELECTRIC COMPANY, Plaintiff,**

v.

**AMERICAN DISTRICT TELEGRAPH COMPANY, Defendant and Third–Party Plaintiff,**

v.

**MARTIN MARIETTA ENERGY SYSTEMS, INC., Third–Party Defendant.**

Civ. A. No. 86–0476–P(J).

United States District Court, W.D. Kentucky, Paducah Division.

March 16, 1989.

**814**

the work to Riley Electric Company (Riley). Riley filed this action seeking damages from ADT for breach of the construction subcontract. In turn, ADT, filed a third-party complaint seeking recovery by way of contribution and/or indemnity from MMES for any damages it may be required to pay Riley. MMES now moves for summary judgment or dismissal of ADT's third-party complaint, claiming this court lacks jurisdiction of the subject matter because the parties contracted that all disputes arising under their agreement would be resolved in accordance with the Contract Disputes Act of 1978 (41 U.S.C. § 601 *et seq.*)

Having considered the record and oral arguments of counsel, it must now be decided whether the Contract Disputes Act of 1978 (CDA or the Act) was intended by Congress to govern disputes between subcontractors and prime contractors performing work at federally owned installations which are operated by private entities.

Thomas J. Keuler, Denton & Keuler, Paducah, Ky., for plaintiff.

Richard L. Walter, Boehl, Stopher, Graves & Deindoerfer, Paducah, Ky., for defendant and third party plaintiff.

Donald C. Wood, Asst. Gen. Counsel, G. Wilson Horde, Gen. Counsel, Martin Marietta Energy Systems, Inc., Oak Ridge, Tenn., E.H. Rayson, Kramer, Rayson, McVeigh, Leake & Rodgers, Knoxville, Tenn., W. Pelham McMurry, McMurry & Livingston, Paducah, Ky., for third party defendant.

## MEMORANDUM AND ORDER

JOHNSTONE, Chief Judge.

The United States of America owns a gaseous diffusion plant at Paducah, Kentucky. Martin Marietta Energy System, Inc. (MMES) operates the plant for the government under a contract with the Department of Energy (DOE). MMES contracted with American District Telegraph Company (ADT) to install a fire alarm system at the plant. ADT then subcontracted

## DOE—MMES CONTRACT

The contract between the United States acting through the Department of Energy (DOE) and MMES in pertinent part provides:

**2. Description of Facilities**

The Government expressly engages the Contractor to manage, operate and maintain (including standby maintenance) the plants and facilities described below and to perform the work and services described in this contract,.... The Contractor undertakes and promises to manage, operate and maintain said plants and facilities, and to perform said work and services, upon the terms and conditions herein provided and in accordance with such directions and instructions not inconsistent with this contract which DOE may deem necessary or give to the Contractor from time to time. In the absence of applicable directions and instructions from DOE, the Contractor will use its best judgment, skill, and care in all matters pertaining to the performance of this contract....

## 29. Property

(b) *Title to Property.* Except as otherwise provided by the Contracting Officer, title to all materials, equipment, supplies, and tangible personal property of every kind and description purchased by the Contractor, for the cost under this contract, shall pass directly from the vendor to the Government....

## 42. Construction

Upon request of the Contracting Officer and acceptance thereof by the Contractor, the Contractor shall procure, by subcontract, the construction of new facilities or the alteration or repair of Government-owned facilities at the plant. Any subcontract entered into under this article shall be subject to the written approval of the Contracting Officer and shall contain the provisions relative to labor and wages required by law to be included in contracts for the construction, alteration, and/or repair, ... on a public building....

### ADT–MMES SUBCONTRACT

The subcontract between MMES and ADT contained the following pertinent provisions:

## 3. Title and Administration.

It is understood and agreed that this subcontract is entered into by the Company [MMES] for and on behalf of the Government; that title to all supplies furnished hereunder by the Seller [ADT] shall pass directly from the Seller to the Government, as purchaser, at the point of delivery; that the Company is authorized to and will make payment hereunder from Government funds advanced and agreed to be advanced to it by DOE, and not from its own assets, and administer this subcontract in other respects for DOE, unless specifically provided for herein; that administration of this subcontract may be transferred from the Company to DOE or its designee, and in case of such transfer and notice thereof to the Seller, the Company shall have no further responsibilities hereunder; and that nothing herein shall preclude liability of the Government for any payment properly due hereunder if for any reason such payment is not made by the Company from such Government funds.

....

## 15. Disputes.

(a) By reason of the Company's entering into this contract as agent for the Government, the Seller is considered a "Contractor" within the meaning of Section 2(4) of the Contract Disputes Act of 1978 (P.L. 95–563) and this contract is subject to such Act.

(b) Except as provided in the Act, all disputes arising under or relating to this contract shall be resolved in accordance with this article.

(c)(1) As used herein "claim" means a written demand or assertion by one of the parties seeking, as a legal right, the payment of money, adjustment or interpretation of contract terms, or other relief, arising under or relating to this contract....

(3) A claim by the Seller shall be made in writing and submitted to the Contracting Officer of the Company's Contract No. W–7405–eng–26 with the Government for decision. A claim by the Company against the Seller shall be subject to a decision by the Contracting Officer of the Company's Contract No. W–7405–eng–26 with the Government....

### THE ADT–MMES DISPUTES CLAUSE

The effect of the disputes clause in this contract must be determined. Courts were once unwilling to enforce these "selection of forum" clauses for reasons of public policy. Such clauses are now given effect provided they are reached through freely negotiated agreements, are not unreasonable or unjust, and their enforcement does not offend due process. *The Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1, 15, 92 S.Ct. 1907, 1916, 32 L.Ed.2d 513 (1972), *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). *See also In–Flight Devices Corp. v. Van Dusen Air, Inc.,* 466 F.2d 220, 234 n. 24 (6th Cir.1972). In *The Bremen,* the Court held that "such clauses are *prima facie* valid and should be enforced unless enforcement is shown by the resisting party

to be 'unreasonable' under the circumstances." *The Bremen, supra* at 10, 92 S.Ct. at 1913. Citations omitted.

MMES argues that the "Disputes" clause is valid and that therefore the dispute with ADT must be resolved under the Act. ADT claims the Act applies only to contracts entered into by an "executive agency" as defined by the Act, that MMES does not fit into that statutory definition, and that therefore the Disputes Clause is inapplicable.

That these two litigants have signed the agreement containing the "Disputes" clause does not necessarily confer jurisdiction over the dispute to the contracting officer. Jurisdictional authority for a contracting officer must have been granted by Congress. Absent such authority, the parties must seek another forum for a resolution. Unless the CDA applies, the Disputes Clause will not deprive this court of jurisdiction.

The court must now determine whether the Contract Disputes Act is applicable in circumstances involving a dispute between a prime contractor and its subcontractor.

### THE CONTRACTS DISPUTES ACT OF 1978

The Contract Disputes Act of 1978 contains rules governing the applicability of the Act. 41 U.S.C. § 602. It reads in pertinent part:

(a) Unless otherwise specifically provided herein, this Act applies to any express or *implied contract ... entered into by an executive agency* for

(1) the procurement of property, other than real property in being;

(2) the procurement of services;

(3) the procurement of construction, alteration, repair or maintenance of real property; or,

(4) the disposal of personal property.

*Id.* (Emphasis added).

41 U.S.C. § 605 contains the administrative review provisions:

(a) All claims by a *contractor against the government* relating to a contract shall be submitted in writing and shall be submitted to the contracting officer for a decision. All claims by the *government against a contractor* relating to a contract shall be the subject of a decision by the contracting officer. (Emphasis added).

41 U.S.C. § 601 provides:

**Definitions**

As used in this Act—

. . . .

(2) the term "executive agency" means an executive department as defined in section 101 of title 5, United States Code, an independent establishment as defined by section 104 of title 5, United States Code (except that it shall not include the General Accounting Office); a military department as defined by section 102 of title 5, United States Code, and a wholly owned Government corporation as defined by section 846 of title 31, United States Code, the United States Postal Service, and the Postal Rate Commission;

(4) The term "contractor" means a party to a Government contract other than the Government;. . . .

The MMES–ADT contract, being primarily a construction contract, is one to which the CDA would apply were the parties to the contract a "contractor" and an "executive agency." However, the court must resolve two issues before it can conclude that the Act applies to the current dispute. The issue raised by ADT is whether MMES qualifies as an "executive agency." Another issue is whether the contract between ADT and MMES is an *"implied contract* entered into by an executive agency," 41 U.S.C. § 602 (emphasis added) and if so whether the CDA and its administrative review provisions govern disputes involving such implied contracts when an "executive agency" is not a party.

The question of whether the administrative review provisions of the CDA apply to disputes between a prime contractor and its subcontractor is one which has not been addressed by the courts. Without such guidance, the court must undertake an examination of the statute and the legislative history of the Act.

As ADT has pointed out and MMES admitted, private corporations acting as agents for an executive agency listed in the statute are not within the literal scope of the definition of "executive agency." Thus, on its face, the statute appears not to apply to a contract unless it was entered into by one of the above listed "executive agencies."

MMES claims however, that under general agency principles it was in fact acting as DOE's agent, that ADT was aware of this agency relationship, and that therefore the CDA should apply. However, MMES cites no cases or legislative history showing that a prime contractor acting as an agent for an "executive agency" itself constitutes an "executive agency" for purposes of the CDA. Indeed, given the rather exclusive definition of "executive agency," it appears that Congress did not intend that mere agents of executive agencies, themselves, qualify as an executive agency for purposes of making the CDA applicable to their contracts with their subcontractors. MMES argues however, that the CDA should apply because the contract at issue was essentially one between ADT and the government.

In support of this argument, MMES cites *A & B Foundry, Inc.*, EBCA No. 118-4-80, 81-1 BCA ¶ 75,000, in which the Department of Energy Board of Contract Appeals held that the CDA applied to a dispute between a subcontractor and its prime contractor. In that case a subcontractor was defaulted by its prime contractor for allegedly breaching its contract to supply materials to the prime contractor. Rather than suing the prime contractor in federal court as did ADT here, the subcontractor chose to file an appeal with the Board of Contract Appeals. However, the jurisdictional issue facing the court presently, whether the CDA applies to disputes between two contractors, was not addressed by the Board. Nor did the Board consider whether the CDA was intended to apply to contracts entered into by an *agent* of an "executive agency." Instead, the Board focused on the issue of whether the CDA allowed subcontractors to bring *any* claim under the Act. In *A & B Foundry*, both the prime contractor and subcontractor *consented* to the Board's jurisdiction and agreed that the Board had jurisdiction under the Act to hear the subcontractor's direct appeal. *Id.* at 75,001.

In its decision, the Board did not address the definition of "executive agency" or whether the CDA applied to disputes arising out of contracts entered into between a sub and prime contractor. Rather, the Board addressed a subsidiary issue, namely, whether a subcontractor was a "contractor" under Section 2(4) for the purpose of determining whether the suit constituted a "[claim] by a contractor" under Section 6. (P.L. 95-563 § 6, 92 Stat. 2384), 41 U.S.C. § 605(a).

In discussing the legislative history of the CDA, the Board was concerned with whether Congress had abandoned the "sponsorship" doctrine, under which subcontractors having claims against the government were required to have their claims sponsored by their prime contractor. Citing legislative history which indicated that Congress did not intend that subcontractors be excluded from the definition of "contractor" for purposes of filing claims directly against the government, the Board held that the CDA applied.[1]

The Board conducted this analysis to determine whether the subcontractor's claim was one which the contracting officer could hear. Unfortunately, in addressing the issue of whether a subcontractor was a "party to a Government contract" 41 U.S.C. § 601(4), and thus a "contractor" which could bring a claim under Section 6, the Board's opinion failed to address the fact that Section 6 speaks only of claims between a contractor and the *government*. 41 U.S.C. § 605(a). Thus, not only must a

---

1. The relevant legislative history was the Senate bill in which the Senate incorporated a specific exclusion of all subcontractors in the definition of "contractor" in section 2(4). *See* S. 2787, 95th Cong.2d Sess., 1978. Noting that the final version of "contractor" contained no such exclusion, the Board determined that Congress intended subcontractors to be included in the definition of "contractor." *A & B Foundry* at 75,-004.

party be a "contractor," under Section 6 it appears that the party must also be pursuing a claim against the "government." Section 6 makes no mention of claims between contractors; it speaks only of claims between a contractor and the government.

Based on the plain language of the statute, it is the opinion of this court that Section 6 does not contemplate the contracting officer acting as a decisionmaker in disputes between a prime and subcontractor. Section 6 in plain language speaks of claims between a "contractor against the government" and the "government against a contractor." Only if the court were to equate the prime contractor with the "government" could it find the requisite Congressional intent for the section's applicability to disputes between a subcontractor and prime contractor. There is nothing in the legislative history or other sections of the Act which requires such a tortured reading.

Although the court has concluded that under Section 6(a), 41 U.S.C. § 605(a), Congress did not intend for the contracting officer to act as decisionmaker in disputes between a prime and subcontractor, because other portions of the Act are less clear on this issue, including section 6(c), 41 U.S.C. § 605(c), which covers claims of $50,000 or less,[2] the court must decide whether under Section 3 of the Act, contracts between a prime contractor and his subcontractor are "implied contracts entered into by an executive agency." 41 U.S.C. § 602(a), P.L. 95–563, § 3, 92 Stat. 2383.

The Act itself, provides no indication that the subcontracts entered into by a government contractor are the kind of implied contracts referred to in Section 3. Nowhere in the Act does there appear any indication that such was the intent of Congress. Furthermore, as mentioned above, Section 6(a) refers only to disputes arising between a contractor and the government. However, because what constitutes an "implied contract" is unclear, the court must again refer to the legislative history of the Act for guidance.

In the final Senate report there is much evidence that Congress did not intend for the CDA to apply to claims between government contractors, thus indicating that subcontracts may not be Section 3 implied contracts. In discussing the "sponsorship" doctrine, *see supra,* the Senate report stated:

> There are a number of advantages in the present sponsorship approach. From the Government's point of view, the sponsorship approach is the best method of administering complex procurements. By administering its procurement through a single point of contact, the Government's job is made both simpler and cheaper. The single point of contact approach also helps suppress frivolous claims.... By forcing the prime contractor to administer its subcontractor network, the Government permits prime contractors and subcontractors at all tiers to use to some extent their familiar commercial procedures in contract award and administration. Finally, *by denying the subcontractors direct access to administrative remedies, the Government is forcing the prime contractor and the subcontractor to negotiate their disputes. Allowing direct access might eliminate some incentive to negotiate a settlement.* This might result in additional time-consuming and expensive litigation.... S.Rep. No. 1118, 95th Cong. 2d Sess. 16–17 *reprinted* in 1978 U.S. Code Cong. & Ad.News 5235, 5250–51.

Thus, it appears that the intent of Congress was to force subcontractors and their prime contractors to negotiate their disputes, not permit them to submit them to the contracting officer. The court concludes that even were it the intent of Congress to make the Act applicable to contracts between a prime and subcontractor

---

2. Section 6(c)(1) provides: "A contracting officer shall issue a decision on *any* submitted claim of $50,000 or less...." (Emphasis added). The court does not conclude that Section 6(c) applies to disputes between contractors. It points out this ambiguity only for purposes of illustrating the need to determine whether such contracts are "implied contracts entered into by an executive agency" under Section 3.)

as "implied contracts entered into by an executive agency" under Section 3, it was clearly not Congress' intent that disputes arising between those parties be submitted to the contracting officer.[3]

Having concluded that the CDA was not intended to govern disputes arising between a prime and subcontractor, the court must declare that section of the contract which requires submission of such disputes to the appropriate contracting officer insufficient to deprive this court of jurisdiction over this action. For this reason and those stated above,

IT IS ORDERED that the motion of Martin Marietta Energy Systems, Inc. to dismiss for lack of subject matter jurisdiction is Denied.

---

**3.** The court today does not decide whether a contract between a prime contractor and a subcontractor would constitute an "implied contract entered into by an executive agency" where the dispute is between a sub contractor and the government. However, *see supra,* regarding the legislative history of the Act regarding the sponsorship doctrine.