**RMI TITANIUM COMPANY,**
Plaintiff–Appellant,

v.

**WESTINGHOUSE ELECTRIC
CORPORATION, et al.,**
Defendants–Appellees.

No. 94–3506.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 2, 1995.

Decided March 22, 1996.

Barton A. Bixenstine (argued and briefed), Ulmer & Berne, Cleveland, OH, for RMI Titanium Company.

John W. Beatty, Frances L. Figetakis, Dinsmore & Shohl, Cincinnati, OH, for Westinghouse Electric Corporation, FERMCO, Phillip C. Weddle.

John D. Luken (argued and briefed), John W. Beatty, Dinsmore & Shohl, Cincinnati, OH, for Westinghouse Environmental Management Company of Ohio, William E. Kortier, Louis Bogar.

John D. Luken, Dinsmore & Shohl, Cincinnati, OH, Douglas C. Ross, Davis, Wright &

Tremaine, Seattle, WA, for Westinghouse Hanford Company.

Michael Anne Johnson, Asst. U.S. Attorney (argued and briefed), Cleveland, OH, for U.S.

Before: SILER and DAUGHTREY, Circuit Judges; ROSEN, District Judge.[*]

ROSEN, District Judge.

Plaintiff/Appellant RMI Titanium Company appeals the decision of the United States District Court for the Northern District of Ohio dismissing RMI's Complaint in its entirety for lack of subject matter jurisdiction. For the reasons stated herein, we affirm.

## I. *INTRODUCTION*

This action arises out of the termination of a government contract to supply uranium extrusions. For 25 years, Plaintiff RMI Titanium Company ("RMI") had directly contracted with the Department of Energy (the "DOE") to produce uranium extrusions at RMI's site in Ashtabula, Ohio. In 1988, however, the DOE interposed Defendant Westinghouse Environmental Management Company ("WEMCO")[1] as the prime management contractor at RMI's Ashtabula site and, at the DOE's direction, RMI and WEMCO entered into a subcontract[2] continuing RMI in the same production role it previously had with the DOE as a direct contractor, but now under the managerial oversight of WEMCO.[3]

The RMI/WEMCO subcontract contained a "Disputes" clause which provided that "all disputes *arising under or related to* this contract" were to be resolved by submitting them to the designated Department of Energy Contracting Officer ("CO"), whose decision would be "final and conclusive and not subject to review by any forum, tribunal or Government agency" except for "an appeal to the DOE Board of Contract Appeals (EBCA)".

Shortly after RMI and WEMCO entered into the subcontract, at the DOE's direction, WEMCO instructed RMI to cease production. In accordance with the Disputes clause, RMI then submitted claims to the Contracting Officer seeking over $125 million in damages for WEMCO's and the DOE's actions. On January 4, 1993, the CO issued his decision finding merit in only one of RMI's claims for which he awarded RMI only $476,837.

Apparently dissatisfied with the Contracting Officer's decision, instead of appealing to the EBCA, four days after the CO issued his decision, on January 8, 1993, RMI instituted this lawsuit, asserting in its Complaint the same allegations it made in its claims to the CO.[4] However, RMI never mentioned in its Complaint that it had filed administrative CDA claims with the CO or that the CO had issued a decision.

In response to RMI's Complaint, the Defendants moved to dismiss pursuant to Fed. R. Civ. Pro. 12(b)(1). The Westinghouse De-

---

[*] The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation.

1. The other Defendants in this action are Westinghouse Electric, WEMCO's parent company; Westinghouse Hanford, another Westinghouse subsidiary; and WEMCO principals, William Kortier, Louis Bogar and Phillip Weddle (collectively referred to herein as the "Westinghouse Defendants"); and the United States of America, which substituted in for originally-named Defendant Ray Hansen, a Department of Energy employee. (Plaintiff opposed the substitution of the Government for Defendant Hansen, and is contesting that substitution as part of this appeal.)

2. At the time of the execution of the subcontract, WEMCO was known as "Westinghouse Materials Company (WMCO)". WEMCO and WMCO are the same company. For convenience, although some of the pertinent documents refer to "WMCO" and some to "WEMCO", WEMCO will be used in the text of this opinion.

3. As discussed *infra*, in 1992, in the midst of the activities that RMI is complaining of, the RMI subcontract with WEMCO was assigned back to the DOE. The assignment expressly relieved WEMCO of all responsibility under the subcontract and, pursuant to the assignment provisions of the subcontract, once the subcontract was assigned, RMI was to "look solely to the DOE for performance of WMCO's obligations."

4. Pursuant to the Disputes clause, RMI had 90-days from the date of the CO's decision to file an appeal with the EBCA. Two weeks after the Defendants moved to dismiss this case, on the 90th day, RMI filed an EBCA appeal.

fendants moved to dismiss for lack of subject matter jurisdiction arguing that the Contract Disputes Act of 1978, 41 U.S.C. § 601 *et seq.* (the "CDA") applied to RMI's claims, and thus preempted district court jurisdiction over this matter. Alternatively, they argued that even if the CDA did not divest the court of jurisdiction, the Disputes clause in the RMI/WEMCO contract precludes RMI from proceeding with a judicial action. The United States also moved separately to dismiss for lack of subject matter jurisdiction by virtue of RMI's failure to exhaust administrative remedies under the Federal Tort Claims Act and on sovereign immunity grounds.

District Judge Thomas Lambros referred Defendants' motions to Magistrate Judge David Perelman for Report and Recommendation. The Magistrate Judge, in two lengthy R & Rs, recommended that both the Westinghouse Defendants' and the Government's motions to dismiss be granted. In a 16–page Memorandum Opinion and Order, Judge Lambros adopted Magistrate Judge Perelman's R & Rs and dismissed RMI's action in its entirety. RMI now appeals.

## II. *FACTUAL BACKGROUND*

RMI is a manufacturer of titanium products and a provider of extrusion services. From 1962 through 1988, RMI was under a direct contract with the Department of Energy to provide uranium extrusions which were then sent to the DOE's Fernald, Ohio facility for use in connection with the DOE's nuclear weapons program. RMI used a DOE-owned press and other DOE-owned equipment at RMI's Ashtabula, Ohio site to produce the uranium extrusions. The DOE also permitted RMI to use the government-owned equipment for its own commercial activities which included providing extrusions and other goods for private customers in the automotive, electronic, aerospace and superconductor industries. For this commercial use, RMI paid the DOE a small fee.

### THE RMI/WEMCO SUBCONTRACT

In April 1988, at the DOE's request, RMI entered into a subcontract with WEMCO under which RMI continued to provide extrusions to the DOE, only now under the managerial oversight of WEMCO. The subcontract also provided for RMI's continued commercial use of DOE-owned equipment. With respect to such commercial use, the subcontract specifically provided:

> It is recognized by the parties hereto that the primary objective of this subcontract is the performance of the subcontract work for WMCO acting on behalf of the DOE. The parties recognize further that the use for commercial purposes of the Government-owned machinery and equipment is a privilege extended by DOE through WMCO to the Subcontractor [RMI]. Accordingly, the unavailability to the Subcontractor of said machinery and equipment for use for commercial purposes for any reason ... shall not constitute a breach of this agreement and no claims for damages or reimbursement of costs of any nature shall be considered under this subcontract. . . .

[Subcontract, C–1, JA p. 208.]

The subcontract also contained explicit provisions for the resolution of disputes "arising under or relating to" the contract. Article A.20 of the General Provisions of the contract provides:

> A. WMCO hereby consents to and the Subcontractor [RMI] agrees to the resolution of all disputes arising under or related to this Contract through the disputes procedure provided under WMCO's prime contract with the DOE, as such procedure is modified herein. In the event that a dispute arises relating to this Contract and is not settled by agreement of the parties hereto, [RMI] shall submit its claim to the Contracting Officer. Any such claim shall state as authority for the request that this Contract is being performed pursuant to Prime Contract No. DE–AC05–860R21600 with the DOE.

> \*　　\*　　\*　　\*　　\*　　\*

> E. The decision of the Contracting Officer shall be final and conclusive and not subject to review by any forum, tribunal or Government agency, except that within 90 days from the date

of receipt of the Contracting Officer's decision, an appeal to the DOE Board of Contract Appeals (EBCA) may be commenced by reference to the Prime Contract referred to in paragraph A of this article and prosecuted in accordance with the rules of procedure of the EBCA.

[JA p. 133.]

Shortly after the execution of the RMI/WEMCO subcontract, the DOE ceased uranium production at Fernald and, therefore, no longer needed the uranium extrusions produced by RMI. In October 1989, the DOE directed WEMCO to cease purchasing uranium extrusions from RMI. According to RMI, WEMCO nonetheless represented that RMI's status as a DOE extrusion resource would continue until September 30, 1991, the formal expiration date of the subcontract.

Subsequently, in January 1990, WEMCO instructed RMI to terminate all extrusion processing of radioactive materials using the DOE equipment but to continue performing environmental remediation at the site as directed by WEMCO. Three months later, in March 1990, WEMCO directed RMI to immediately initiate the de-licensing of all extrusion operations at the Ashtabula facility, effectively putting to an end not only RMI's DOE production but its other commercial production, as well.

Defendants contend that WEMCO's directives came at the instruction of the DOE, and that RMI was aware of that fact. (In defending the motion to dismiss, however, RMI disputes this contending that WEMCO acted solely on its own and for its own private interests.[5])

As evidence of RMI's understanding that the directives originated from the DOE, WEMCO points to RMI's 1990 and 1991 10-K forms submitted to the SEC which include the following statement:

> Through October 1990, the Company's [RMI's] Extrusion Division converted copper, aluminum, titanium and other specialty metal alloys into extrusions for commercial and aerospace markets. It also had a contract to convert depleted uranium for the Department of Energy ("DOE"). DOE, through the prime contractor, notified the Company of a change in the scope of the contract from a production site to a remediation and restoration site. As a result of this contract change, the Company no longer conducts commercial conversion work at the facility. The loss of this commercial business did not have a material adverse affect on consolidated sales or net income in 1991.

[JA p. 352. See also JA p. 346.]

### RMI'S ADMINISTRATIVE CDA CLAIMS

After it was ordered to cease extrusion operations, RMI filed three separate claims with the DOE Contracting Officer as provided in the "Disputes" clause in the RMI/WEMCO contract seeking declaratory relief and recovery of damages in excess of $150 million.[6]

### THE AUGUST 1, 1991 CLAIM

In the first claim filed on August 1, 1991, RMI sought $12.13 million in damages for the termination of its DOE extrusion contract, for the loss of its commercial business, and for the loss of environmental clean up fees.[7]

---

5. RMI contends that the Defendants acted alone and in concert with each other to oust RMI from governmental and commercial extrusion so that the work could be taken over by Westinghouse and its subsidiaries, particularly Westinghouse Hanford, which, at the time, operated an extrusion facility similar to the Ashtabula facility in the State of Washington. (Defendants state in their Response Brief that Westinghouse Hanford no longer has anything to do with the Washington facility.) RMI also contends that the Defendants acted in concert to take over RMI's environmental management work even at its own Ashtabula site.

6. The three claims were filed on August 1, 1991, September 17, 1991 and November 10, 1992.

7. With respect to lost environmental clean up fees, it appears that RMI is relying on a provision in its subcontract wherein it is stated that costs of decontamination, clean up, disposal, restoration, remediation and property management are "allowable costs" to be paid by the Government. RMI interprets this to mean that only RMI is entitled (1) to perform environmental clean up at the Ashtabula site however it wanted to and not as WEMCO directed, and (2) to collect the costs of doing so from the Government. [See JA pp. 23–24.]

In the August 1991 claim, RMI acknowledged that DOE Technical Representative Malcolm Theisen wrote RMI in 1987 advising that the Department's workload at the Ashtabula site was "trending downward and [would] surely never reach the levels we were forecasting a couple of years ago," and that there was "little likelihood that the DOE workload [would] be higher than currently forecast." [JA p. 226.] Theisen also stated in his 1987 letter, "I hope you will be able to solicit enough private work to keep your current staff occupied." *Id.* It is based solely on this last statement that RMI claimed in its August 1991 claim—and in the Complaint it filed in the Northern District of Ohio—that the DOE "press[ed] RMI to step up its commercial extrusion operations." [JA pp. 226; 227.]

Notwithstanding its acknowledgement of having known at least since 1987 that the DOE's demand for RMI's extrusion services was dwindling, RMI alleged in its August 1991 claim that it relied on WEMCO's assurance that its contract for DOE extrusion services, which was not scheduled to terminate until 1991, would remain unchanged. According to RMI:

> After representing in October, 1989 that its Subcontract with RMI would continue through its expiration date at the end of FY91, WMCO abruptly terminated RMI as a provider of extrusion services [then] eliminated RMI's contractual right to control the restoration of its own property.

[JA p. 218.]

> RMI further claimed in its August 1991 claim that WEMCO twisted RMI's restoration rights into a club to drive RMI out of the commercial extrusion business, thereby opening up the commercial extrusion market to the Hanford, Washington

extrusion facility operated by WMCO's sister corporation, Westinghouse Hanford Company, along with the lucrative potential of the pending super superconducting collider extrusion business.

*Id.*

RMI alleged that the termination of its government contract and alleged attendant rights to continue using the DOE press for private commercial business and to control, without WEMCO supervision, the environmental clean up of the Ashtabula site were achieved through WEMCO's "trumped up charges of RMI's supposed incompetence" and that in so doing, WEMCO "acted solely for its own profit." [JA p. 221–222.] However, this assertion is contradicted by the "facts" even as alleged by RMI in its August 1991 claim. In the claim RMI states that it was at a *joint* meeting of **DOE, WEMCO and RMI** representatives in July 1990 that a "change order" authorized under Article A.4 of the Subcontract was issued directing the shutdown of all extrusion work and immediate commencement of environmental restoration directed by WEMCO. [JA p. 232.][8]

### THE SEPTEMBER 17, 1991 CLAIM

Six weeks later, on September 17, 1991, RMI filed a second claim with the DOE designated Contracting Officer for an additional $15 million in damages which it claimed was owed to it for the loss of environmental management fees it contended it was entitled to under the Subcontract. In RMI's own words, this second claim was "premised on WEMCO's wholesale interference with RMI's restoration and remediation activities under [the] Subcontract." [JA p. 264.]

---

8. Article A.4 provides as follows:
    A. WMCO may at any time, by written order, ... make changes within the general scope of this Contract in any one or more of the following: (1) *Description of Services to be performed.*
    ...
    B. If any such change causes an increase or decrease in the estimated cost of, or the time required for, performance of any part of the work, whether or not changed by the order, or otherwise affects any other terms and conditions of this Contract, WMCO shall make an equitable adjustment in the (1) estimated cost, delivery or completion schedule, or both; (2) amount of any fixed fee; and (3) other affected terms and shall modify this Contract accordingly....
    D. Failure to agree to any adjustment shall be a dispute under the Disputes article. However, nothing in this article shall excuse Seller from proceeding with this Contract as changed....
    [JA p. 116]

RMI argued, as it does in this action, that it had the right under the Subcontract to conduct environmental restoration and remediation at the Ashtabula site by itself without WEMCO's supervision. RMI alleged that the objective of WEMCO's July 1990 "change order" was to drive RMI out of its commercial extrusion business to the benefit of WEMCO's sister company, Westinghouse Hanford, which operated an extrusion facility in Hanford, Washington. [JA p. 262.] RMI believed that WEMCO's action amounted to "a concerted plan to take away RMI's contractual right to restore its own property, and with it, the millions of dollars of management fees that the restoration process will generate" [JA p. 264] by engaging in "a secret campaign of libeling RMI's capabilities [to the DOE]." [JA p. 266, 269.] [9]

## THE NOVEMBER 10, 1992 CLAIM

In November 1992, RMI filed yet a third claim with the Contracting Officer, and asked for "an immediate Contracting Officer's decision". In this claim, RMI alleged that the DOE refused to acknowledge its funding obligations to RMI under the RMI/WEMCO subcontract for environmental clean up fees. RMI asked the CO to order the DOE to immediately pay to RMI $125 million, which it contended was the anticipated cost of environmental restoration of the Ashtabula site. [See JA 327–330.]

## CLAIM CERTIFICATIONS

All three of RMI's claims to the DOE Contracting Officer closed with the following "Certification":

> This claim is submitted pursuant to the Contract Disputes Act of 1978, 41 U.S.C. § 601 et seq. As a result you are required to resolve this claim by (1) granting the relief RMI has requested, (2) issuing a final decision denying the requested relief in whole or in part, or (3) establishing a binding and reasonable schedule for processing this claim within 60 days of the date of claim submission.

## ASSIGNMENT OF SUBCONTRACT BACK TO DOE

Before the Contracting Officer issued any decision on RMI's claims, on November 30, 1992, WEMCO and RMI executed a "Modification" to their Subcontract. The purpose of the Modification was to assign the entire subcontract back to the Department of Energy. It also extended the term of the subcontract through March 31, 1993.

The Modification was entered into pursuant to Article A.7 of the Subcontract which provided:

> WMCO may assign this Contract, in whole or in part, to DOE or to such party as DOE may designate to perform WMCO's obligations hereunder. *Upon receipt by Seller of written notice that the DOE or a party so designated by the DOE has accepted an assignment of this Contract,* **WMCO shall be relieved of all responsibility hereunder and Seller shall thereafter look solely to such assignee for performance of WMCO's obligations**....

The Modification itself provided:

> It is understood that in the event payments under this subcontract are not made on or before November 30, 1992, this subcontract shall be automatically assigned to DOE, effective December 1, 1992 for completion, and *upon such assignment, WEMCO shall be relieved of any further obligations hereunder.*

[JA p. 333.]

## THE CONTRACTING OFFICER'S DECISION

On January 4, 1993, the Contracting Officer issued his "final decision" on the three claims. The CO noted that RMI and WEMCO had attempted to settle the claims and they ultimately agreed in August 1992 (i.e., prior to RMI's submission of its last claim for $125 million) to WEMCO's payment of $5,335,875. WEMCO submitted the settlement to the DOE for approval on August 21, 1992. However, on October 27, 1992, DOE *rejected* the settlement agreement. (Appar-

---

**9.** These allegations are also the bases for RMI's claims in this action for violation of the Sherman Act (monopolizing the market) and the Lanham Act (commercial defamation).

ently, it was in response to the DOE's rejection that RMI filed its third claim seeking immediate payment from the DOE of $125 million.)

In his written decision, the Contracting Officer discussed all of RMI's various claims for lost contract revenues; loss of its private commercial extrusion business; loss of the use of its property during the time required for remediation; loss of the use of the equipment owned by the government and anticipated lost revenues as a result of being denied the right to perform its own remediation and clean-up of the property. The CO found RMI to be entitled to damages under only one of the elements of its three separate claims, to-wit, the claim for lost use of its facilities during the time it would take to complete environmental remediation and restoration. Accordingly, the CO ordered payment to RMI of $476,837.81 to be paid directly to RMI by Treasury Check provided that RMI would sign and return a release for this element of its claim no later than February 8, 1993. *Id.*

The last section of the CO's Decision is captioned *"APPEAL RIGHTS."* It provides:

As CO, this document constitutes the writer's final decision. *You may appeal the decision to the Department of Energy Board of Contract Appeals (EBCA) in accordance with the terms of the Disputes Article, subcontract No. 2–7726. The decision of the CO shall be final and conclusive and not subject to review by any forum, tribunal, or Government agency, except that, within 90 days from the date of receipt of the CO's decision, an appeal to the EBCA may be commenced by reference to the Prime Contract referred to in paragraph A of the Disputes Article and prosecuted in accordance with the rules of procedure of the EBCA.* If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the DOE Board of Contract Appeals and provide a copy to the undersigned. The notice shall indicate that an appeal is intended, refer-

ence this decision, and identify the subcontract by number.
[JA p. 340.]

### RMI'S INSTITUTION OF THIS ACTION

Rather than appeal to the EBCA, four days after the CO issued his decision, RMI filed a Complaint in the District Court for the Northern District of Ohio seeking declaratory relief and damages in excess of $150 million. In that Complaint, RMI made essentially the same allegations that it made in its claims to the Contracting Officer, i.e., that the Westinghouse Defendants libeled RMI to the DOE; engaged in a conspiracy to terminate RMI's contract to provide the Government with extrusion services; interfered with and conspired to eliminate RMI's commercial extrusion business to permit Westinghouse to take over the extrusion services market; and conspired to remove RMI from the environmental restoration of its Ashtabula site.

In its Complaint in this action, RMI alleged that it is entitled to damages for these actions under several legal theories of recovery. Plaintiff alleged that the Defendants' "conspiracy to drive RMI out of the commercial extrusion business" amounted to (1) a violation of the Sherman Act and Ohio's Monopoly Statute; (2) tortious interference with business relations, and (3) unfair competition under Ohio law. Plaintiff also alleged that Defendants' accusations of RMI's incompetence and inability to perform its own environmental restoration amount to defamation and a violation of the Lanham Act (Count 4). RMI further alleged a count of "bad faith breach of [RMI's] subcontract" on the part of WEMCO (Count 5) and a count of "estoppel," predicated upon WEMCO's alleged representation in October 1991 that RMI's subcontract would remain unchanged through its scheduled expiration date in September 1991 (Count 6). However, nowhere in Plaintiff's Complaint was it even mentioned that RMI had filed administrative claims with the DOE Contracting Officer and received an unfavorable ruling from the CO.

In response to Plaintiff's Complaint, the Westinghouse Defendants moved to dismiss pursuant to Fed. R. Civ. Pro. 12(b)(1) arguing that the federal court was divested of jurisdiction over Plaintiff's action by virtue of the Contract Disputes Act and/or the Disputes Clause of the RMI/WEMCO Subcon-

tract.[10]

After Defendants filed their Motions to Dismiss, RMI served notice on the Department of Energy (but not on the Westinghouse Defendants) of an appeal to the EBCA of parts of the CO's decision. The EBCA appeal notice contained a "disclaimer" which stated:

On January 8, 1993, RMI filed a civil action in the United States District Court, Northern District of Ohio against WEM-CO and others, premised in part on RMI's conviction that, notwithstanding the terms of the disputes clause in Subcontract 2-77226, this Board lacks jurisdiction to entertain RMI's contract disputes with WEMCO. This jurisdictional issue is currently pending before the District Court.[11] By filing this Notice of Appeal, RMI Titanium Company does not concede the issue of EBCA jurisdiction, but is acting to preserve its appeal rights before the EBCA under Subcontract 2-77226 in the event it is determined that the EBCA has jurisdiction to entertain RMI's appeal.

In response to the Westinghouse Defendants' Motion to Dismiss, RMI argued that its claims in this judicial action are not preempted by the Contract Disputes Act contending (1) that claims raised by subcontractors against private parties are not within the province of the CDA and (2) the claims in this action do not arise from any contract with the Government. With respect to the Defendants' alternative argument that the federal court was precluded from hearing Plaintiff's claims by virtue of the Subcontract Disputes Clause, RMI argued that that clause "must be construed to encompass only 'sponsorship' claims"—i.e., claims that a subcontractor asks a prime contractor to assert on the subcontractor's behalf—as opposed to "direct" claims asserted by the subcontractor.

The Magistrate Judge and the District Judge rejected all of RMI's arguments and found that RMI's claims in this action were "claims relating to a government contract" and, as a result, all of the claims were subject to the CDA. Therefore, the court concluded that federal court jurisdiction over the claims was preempted. The court also determined that even if the CDA did not govern Plaintiff's action, RMI was precluded from pursuing its claims in a judicial forum by virtue of the Disputes Clause in the RMI/WEMCO Subcontract.

As indicated above, RMI also named a DOE employee, Ray Hansen, as a party-defendant. The Government moved to substitute in for Mr. Hansen and concurrently moved to dismiss contending that RMI's claims against Defendant Hansen were barred by application of the doctrine of sovereign immunity. Alternatively, the Government argued that, even if sovereign immunity did not apply, the claims would only be cognizable under the Federal Tort Claims Act and RMI failed to exhaust its administrative remedies under that Act.[12] Thus, the Government argued that the court had no jurisdiction to entertain RMI's claims against DOE employee Hansen. The Court agreed and granted both the motion for substitution and the motion to dismiss.

### III. DISCUSSION

### A. STANDARD OF REVIEW APPLICABLE TO DISMISSALS UNDER FED. R.CIV.PRO.12(b)(1)

The Westinghouse Defendants argue that the "clearly erroneous" standard is the appropriate standard of review applicable in reviewing dismissals for lack of jurisdiction under Fed. R. Civ. Pro. 12(b)(1). The Government and Plaintiff argue that Rule 12(b)(1) dismissals, as with dismissals under

---

**10.** The Government also moved to dismiss on the basis of sovereign immunity.

**11.** Contrary to RMI's assertion in its EBCA appeal "disclaimer", nowhere is it alleged in Plaintiff's Complaint that RMI disputed EBCA jurisdiction. That issue was never addressed by RMI until after Defendants filed their Motions to Dismiss.

**12.** The Government also moved to dismiss on insufficiency of process grounds. The district court found no merit in that argument, and the district court's decision on this issue is not being challenged in this appeal.

Rule 12(b)(6) and summary judgment under Fed. R. Civ. Pro. 56, call for *de novo* review.

The various Rule 12 motions to dismiss on the pleadings (and the standards applicable to such motions) are often confused with each other. In the oft-quoted decision of the Third Circuit in *Mortensen v. First Federal Savings and Loan Ass'n*, 549 F.2d 884, 890 (3d Cir.1977), the court explained the distinction between dismissals under Rule 12(b)(1) and Rule 12(b)(6):

> The basic difference among the various 12(b) motions is, of course, that 12(b)(6) alone necessitates a ruling on the merits of the claim, the others deal with procedural defects. Because 12(b)(6) results in a determination on the merits at an early stage of plaintiff's case, the plaintiff is afforded the safeguard of having all its allegations taken as true and all inferences favorable to plaintiff will be drawn. The decision disposing the case is then purely on the legal sufficiency of plaintiff's case: even were plaintiff to prove all its allegations he or she would be unable to prevail. In the interests of judicial economy it is not improper to dispose of the claim at that stage. If the court considers matters outside the pleadings before it in a 12(b)(6) motion, the above procedure will automatically be converted into a Rule 56 summary judgment procedure. Here there are further safeguards for the plaintiff: in addition to having all of plaintiff's allegations taken as true, with all their favorable inferences, the trial court cannot grant a summary judgment unless there is no genuine issue of material fact.
>
> *The procedure under a motion to dismiss for lack of subject matter jurisdiction is quite different. At the outset we must emphasize a crucial distinction, often overlooked between 12(b)(1) motions that attack the complaint on its face and 12(b)(1) motions that attack the existence of subject matter jurisdiction in fact, quite apart from any pleadings. the facial attack does offer similar safeguards to the plaintiff: the court must consider the allegations of the complaint as true. The factual attack, however, differs greatly for here the trial court may proceed as it never could under 12(b)(6) or Fed.R.Civ.Pro. 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction—its very power to hear the case—there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Moreover the plaintiff will have the burden of proof that jurisdiction does in fact exist.*

549 F.2d at 890–891 (emphasis added). *See also, Thornhill Publishing Co. v. General Telephone & Electronics Corp.*, 594 F.2d 730, 732–734 (9th Cir.1979); *Williamson v. Tucker*, 645 F.2d 404, 412–414 (5th Cir.), *cert. denied*, 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981); *Osborn v. United States*, 918 F.2d 724, 728–730 (8th Cir.1990); *Holt v. United States*, 46 F.3d 1000, 1002–1003 (10th Cir.1995).

The Sixth Circuit adheres to the 12(b)(1)/12(b)(6) distinction noted by the courts in the above-cited cases. In *Rogers v. Stratton Industries, Inc.*, 798 F.2d 913 (6th Cir.1986), the Court explained:

> [I]n a Rule 12(b)(6) motion in which matters outside the record are relied upon as they were here, the moving party (here defendants) had the burden of showing there are no genuine issues as to any material facts, as the motion shall be treated as one for summary judgment. Fed. R.Civ.P. 56(c). Conversely, *where subject matter jurisdiction is challenged under Rule 12(b)(1), as it was here, the plaintiff has the burden of proving jurisdiction in order to survive the motion. Perhaps even more importantly, when a Rule 12(b)(6) motion is converted to a Rule 56 motion for summary judgment, the court, upon finding genuine issues as to material facts, must deny the motion; whereas on a Rule 12(b)(1) challenge to subject matter jurisdiction, the court is empowered to resolve factual disputes.*

798 F.2d at 915 (footnotes and citations omitted.) *See also, Ohio National Life Insur-*

*ance Co. v. United States,* 922 F.2d 320, 324–325 (6th Cir.1990).

In the instant case, Defendants' Rule 12(b)(1) motions did not mount a mere "facial" challenge to the Plaintiff's complaint allegations of jurisdiction. Rather, the district court was called upon to weigh the evidence concerning jurisdiction presented by the parties and decide the jurisdictional facts.

■ Where a trial court's ruling on jurisdiction is based in part on the resolution of factual disputes, a reviewing court must accept the district court's factual findings unless they are clearly erroneous. *Ohio National Life Ins. Co. v. United States, supra,* 922 F.2d at 326; *Osborn v. United States, supra,* 918 F.2d at 732 (if the trial court relied upon its own determination of disputed factual issues, the appellate court must then review those findings under the "clearly erroneous" standard); *Holt v. United States, supra,* 46 F.3d at 1003. However, review of the district court's *application of the law* to the facts is *de novo. Ynclan v. Department of Air Force,* 943 F.2d 1388, 1390 (5th Cir.1991); *Holt v. United States, supra.*

## B. *PLAINTIFF'S CLAIMS AGAINST THE WESTINGHOUSE DEFENDANTS ARE PREEMPTED UNDER THE CONTRACT DISPUTES ACT*

The Contract Disputes Act, 41 U.S.C. § 601 *et seq.* (the "CDA"), statutorily provides explicit dispute resolution procedures for all claims "relating to" any express or implied contract entered into by an executive agency for—

(1) the procurement of property, other than real property in being;

(2) the procurement of services;

(3) the procurement of construction, alteration, repair or maintenance of real property; or

(4) the disposal of personal property.

41 U.S.C. §§ 602, 605.

The procedures established for contractors' claims are set forth in §§ 605–609 of the Act. Pursuant to the statutory scheme, a contractor's claims against the government which relate to a contract must be submitted to a "contracting officer." 41 U.S.C. § 605(a). The contracting officer's decision is reviewable only through an appeal to an agency board of contract appeals. 41 U.S.C. §§ 605(b), 606, 607.[13] The statute also provides an alternative to an agency board appeal by permitting an appeal through an action filed in the United States Court of Federal Claims. 41 U.S.C. § 609(a).[14]

■ The term "claims" as utilized in the CDA is to be given broad effect, encompassing all claims and disputes, whether arising under or relating to the contract. *Z.A.N. Company v. United States,* 6 Cl.Ct. 298, 303 (1984). Thus, in *Z.A.N.,* the court held that the term "claim" as used in the CDA means an "assertion by one of the parties seeking, as a matter of right, the payment of money, adjustment, or interpretation of contract terms, or other relief arising under or relating to the contract." *Id.*

As set forth above, claims brought "relating to a contract" must be submitted to the appropriate contracting officer, with subsequent appeals to either the agency's board of contract appeals or the United States Claims Court. Once it is determined that the CDA applies to the dispute in question, federal court jurisdiction is precluded. 28 U.S.C. § 1346(a)(2).

Thus, the question presented is whether the Contract Disputes Act applies to Plaintiff's claims against the Westinghouse Defendants. In this case, resolution of this question requires a two-pronged analysis:

(1) Whether the Plaintiff's action against Westinghouse is, at its essence, a contractual dispute subject to application of the CDA; and

---

**13.** The decision of an agency board may be appealed to the United States Court of Appeals for the Federal Circuit. 41 U.S.C. § 607(g)(1)(A).

**14.** The alternative Court of Claims appeal is available to a contractors "notwithstanding any contract provision, regulation or rule of law to the contrary." 41 U.S.C. § 609(a)(1).

(2) Whether Plaintiff's status as a "subcontractor" renders the CDA inapplicable.

## 1. ALL OF PLAINTIFF'S CLAIMS ARE "ESSENTIALLY CONTRACTUAL"

■■■ As the district court observed, for the CDA to apply, it must first be determined that the claims asserted are "essentially contractual" in nature. *Megapulse, Inc. v. Lewis,* 672 F.2d 959, 967 (D.C.Cir. 1982). The plaintiff's title or characterization of its claims is not controlling. "[A] plaintiff may not avoid the jurisdictional bar of the CDA merely by alleging violations of regulatory or statutory provisions." *Ingersoll–Rand Co. v. United States,* 780 F.2d 74, 77 (D.C.Cir.1985). Rather, it is the determination of whether the action is essentially a contract dispute that controls. *Id.* "The classification of a particular action as one which is or is not 'at its essence' a contract action depends both on the source of the rights upon which the plaintiff bases its claim, and upon the type of relief sought (or appropriate)." *Megapulse, supra* at 968.

■■■ As set forth above, with respect to RMI's complaints against WEMCO and the Department of Energy, RMI *did* originally proceed with seeking redress pursuant to the CDA process. It filed three claims with the contracting officer, each of which included an express certification that the claims were being submitted "pursuant to" the CDA as a result of their "relation to a contract." Although RMI now concedes that its "contract" claims (Counts V and VI of the Complaint) are subject to the CDA, it denies application of the CDA to the other four counts in its Complaint which RMI characterizes as "non-contract claims".

To determine whether RMI's judicial action was in essence a contract dispute, the district court examined Plaintiff's Complaint paragraph by paragraph and compared it to the allegations in the three claims submitted by RMI to the CO. Both the magistrate judge and the district judge found that the allegations in the complaint and in the three claims closely parallel each other, some times using the exact same language. Moreover, the concluding section of the complaint captioned "PRAYER FOR RELIEF" and the section headed "INJURY AND DAMAGES" mirror almost word for word the requested relief sought in each of the three claims.

The only difference noted between the claims and the complaint is that the complaint contains allegations of violation of the Sherman Act, 15 U.S.C. §§ 1 and 2, and the Lanham Act, 15 U.S.C. § 1125(a).

However, in this case, the existence of a contract is essential for Plaintiff to maintain its Sherman Act claims. Plaintiff's allegations as to the Sherman Act violations are that WEMCO acted in violation of its contract with RMI and ordered RMI to cease using equipment owned by the DOE for its private commercial extrusion business so as to gain a monopoly of the extrusion business for its sister company Westinghouse Hanford. RMI further claims that WEMCO denied RMI its contractual right to manage the environmental restoration of the facilities to gain a monopoly for itself in the environmental clean up business. Thus, to succeed with its Sherman Act claim, Plaintiff must prove that a contract existed, and that the purpose and effect of the contract is restraint of trade and suppression of competition. *See White & White, Inc. v. American Hospital Supply Corp.,* 723 F.2d 495, 504–505 (6th Cir.1983).

Similarly, the basis for Plaintiff's Lanham Act and defamation claims is that WEMCO lied to the DOE by alleging that RMI was not satisfactorily performing its contractual obligations.

Thus, as the district court found, Plaintiff's allegations of violation of federal and state statutes

cannot negate the fact that the contractual claims which RMI certified to the Contracting Officer are essentially the same claims which underlie its allegations in the instant proceedings—that RMI was entitled to continue to utilize equipment owned by the DOE for private commercial sales, that RMI was entitled to continue to function as an extrusion supplier to the DOE, that RMI incurred monetary losses as a consequence of the termination of that role, that RMI is entitled to engage in environmental remediation of its premises at the expense of the DOE, and that RMI

has incurred monetary losses as a consequence of environmental harm to the premises.

Accordingly, the district court concluded, the rights asserted by RMI, "are undoubtedly contractual in nature, as they could not be considered without reliance upon the subcontract [and] analysis of the causes of action raised herein could not be undertaken without addressing the contractual issues raised both before the Contracting Officer and in this proceeding."

Just as the Federal Circuit found in *Ingersoll–Rand, supra,* Plaintiff's complaint claims in this case are nothing more than "disguised contract claims," and as such, must be resolved under the CDA. *See also, Colt Industries, Inc. v. United States,* 716 F.Supp. 660 (D.D.C.1989) (plaintiff's claims of violation of the Trade Secrets Act, negligence, and breach of contract held preempted under the CDA because the source of all the rights upon which the plaintiff based its claims was a license agreement with the government).

In support of its "no CDA coverage" argument, Plaintiff relies principally on *Megapulse, Inc. v. Lewis, supra.* That case is readily distinguishable from the instant action. In *Megapulse,* the plaintiff sued the Department of Transportation and others for disclosing information concerning Megapulse's development of navigation system which was provided to the Department in attempting to obtain a government contract for its production. Megapulse ultimately did obtain a contract with the Coast Guard to produce a prototype of its system. The Coast Guard subsequently announced that it would accept bids for production of the system. In connection with the bidding process, it disclosed Megapulse's proprietary information to prospective bidders. Megapulse brought suit in the federal district court for the District of Columbia for violation of the federal Trade Secrets Act.

The district court dismissed the action on the basis of CDA preemption. The Federal Circuit reversed. The appellate court determined that jurisdiction in the district court was proper because the claims alleged in the plaintiff's complaint *were not based on a contract.* As the court explained in that case,

> [Plaintiff] does not claim a breach of contract, it has limited its request for relief to only six documents "reflecting the essence of the proprietary technology developed ... ***prior to the parties' first contract***", it seeks no monetary damages against the United States, and its claim is not properly characterized as one for specific performance. Appellant's position is ultimately based, not on breach of contract, but on an alleged governmental infringement of property rights and violation of the Trade Secrets Act.

672 F.2d at 968 (some emphasis added).[15]

Not only is *Megapulse* factually distinguishable from this case, more importantly, it appears that the case may no longer be good law. During the pendency of this appeal, the U.S. Court of Appeals for the District of Columbia Circuit, which was the court that decided *Megapulse,* rejected the notion of a "pre-contract" exception to CDA preemption in *A & S Council Oil Co., Inc. v. Lader,* 56 F.3d 234 (D.C.Cir.1995). In *A & S,* petroleum suppliers brought an action in a federal district court against the Small Business Administration based upon allegations of misconduct on the part of the SBA during pre-contract negotiations for the provision of petroleum to military installations. The district court initially found that it lacked jurisdiction over the action by virtue of the CDA, and transferred the matter to the U.S. Claims Court. The Claims Court found no CDA preemption because the plaintiffs disavowed that they were alleging any contract claims and because the complained of acts of

**15.** The other cases cited by Plaintiff are similarly distinguishable. *Walsh v. U.S.,* 672 F.2d 746 (9th Cir.1982) (plaintiff's claim for damage to his livestock not a CDA claim because right to reasonable use of his real property at issue, not a contract entered into between a third party and the government); *Love v. U.S.,* 915 F.2d 1242 (9th Cir.1989) (conversion claim not subject to CDA because liability depended not on contract with the government but on the plaintiff's claim of ownership of the property); *Metadure Corp. v. U.S.,* 490 F.Supp. 1368 (S.D.N.Y.1980) (Privacy Act claim not subject to CDA because no government contract was at issue; the mere fact that plaintiff was a government contractor insufficient for CDA preemption).

the SBA occurred prior to the execution of a contract with the petroleum suppliers. On appeal, the D.C. Circuit reversed the Claims Court's determination of no CDA preemption:

> The point on which the Claims Court rested—that the claimed acts of illegality were statutory violations anterior to the contract formation—does not seem to us to render the claims non-contractual. In the first place, any number of standard contract doctrines, such as duress and mistake of fact involve pre-contract behavior.
>
> \* \* \* \* \* \*
>
> It is true that plaintiffs have disavowed the notion that they are making contract claims. Instead, they say, the damages they have suffered flow from unlawful agency action. That is in a sense true.... *In any event, a plaintiff may not avoid the jurisdictional bar of the CDA merely by alleging violations of regulatory or statutory provisions rather than breach of contract.* Where the alleged damage is entirely due to and measured in reference to plaintiffs' performance of a contract, and is exclusively money damages, *plaintiffs' claim that the wrong originated in some statutory violation does not strip the case of its contractual character.*

56 F.3d at 240–241 (citations omitted and emphasis added).

### 2. RMI'S STATUS AS A SUBCONTRACTOR DOES NOT DEFEAT CDA PREEMPTION

■ RMI also argues, as it did in the lower court, that even if its complaint is essentially a contract action, the court is not divested of jurisdiction by the CDA because the contract complained of was between RMI and WEMCO, not RMI and the Government. The district court was not persuaded by RMI's argument.

As the district court observed, the position advanced by RMI was squarely rejected in *Eastern, Inc. v. Shelly's of Delaware, Inc.,* 721 F.Supp. 649 (D.N.J.1989). Defendant Shelly's was a general contractor that had a contract with the government for the construction of a new post office building. Shelly's, in turn, entered into a subcontract with the plaintiff, Eastern, to perform roofing work on the new building. Subsequently, Shelly's abandoned the project and another general contractor, Jennings, took over. Eastern continued to work on the project after receiving assurance from Jennings and Shelly's sureties that it would be properly remunerated for its work. After completing a significant amount of roofing work, Jennings terminated Eastern from the project and refused to pay for the work completed.

Eastern filed a complaint in the federal district court in which it named Shelly's, Jennings and the sureties as defendants alleging breach of contract, fraud and conversion. In addition, Eastern named the postal service alleging that as a subcontractor, it held an equitable interest in the contract balance owed by the postal service to the general contractor. The defendants moved to dismiss Eastern's complaint under Fed. R. Civ. Pro. 12(b)(1) arguing that the court lacked jurisdiction over the action by virtue of CDA preemption.

Although Eastern was only a subcontractor which did not have a direct contract with the postal service, the court agreed that Eastern's action was preempted under the CDA. In reaching its conclusion, the *Eastern* court examined the legislative history of the CDA. The court observed that Congress enacted the CDA to provide a "comprehensive system for adjudicating contract claims against the government." 721 F.Supp. at 651. The court then examined the plaintiff's argument that by its terms, the CDA does not provide for claims brought by subcontractor. *Id.* While the court acknowledged that the plaintiff's argument had "some appeal", it found that the express purpose of the CDA would be frustrated if subcontractors were allowed to bring judicial actions against government agencies when general contractors were not. *Id.* The court reasoned:

> [The CDA] was enacted by Congress to cure the ills associated with the prior system of government contract dispute resolution. That system, in which contract disputes could be brought in a number of fora including the district courts, was "often too expensive and time consuming for the effi-

cient and cost-effective resolution of claims." S.Rep. No. 1118, 95th Cong., 2d Sess. 4, *reprinted in* U.S.Code Cong. & Ad. News, 5235, 5238. This new system created under the CDA, in which all contract claims must be brought in either the Board of Contract Appeals or the Claims Court was adopted because it was thought to be more efficient in terms of time and money. *Id.* This efficiency in turn would facilitate the creation of government contracts since the executive agencies would be less circumspect about entering into contracts. The aims of the CDA, it seems to us, are the facilitation of both contract dispute resolution and the formation of government contracts.

Allowing subcontractors to bring actions against the USPS in district court would contravene these objectives. It is indeed true, as plaintiff points out, that the provisions of the CDA do not [on their face] apply to subcontractors. At the same time, however, Congress could not have expected subcontractors to have access to district courts after it closed the doors of district courts to contractors. The twin aims of the CDA reflect Congress' desire to eliminate the unnecessary costs arising from government contracts. Permitting subcontractors to bring actions against the USPS in district court, however, would increase these costs in several ways. First, an executive agency that has entered into a contract with a general contractor would potentially be subject to suit by dozens of subcontractors in district court, which as the CDA indicates, Congress views as an inefficient forum for resolution of contract-based problems. Second, allowing subcontractors to proceed in district court would frustrate the formation of government contracts. The specter of dozens of subcontractors bringing actions against a governmental agency in district court may very well chill the agency's enthusiasm to enter into contracts.

721 F.Supp. at 651–52 (some citations omitted). *See also, Arntz Contracting Co.,* EBCA No. 187–12–81, 84–3 BCA (CCH) ¶ 17,604, 1984 WL 13945 (1984), *aff'd, Arntz Contracting Co. v. United States,* 769 F.2d 770 (Fed.Cir.1985) (holding that CDA applied to subcontractor's claims against general contractor).

RMI relies principally on *United States v. Johnson Controls, Inc.,* 713 F.2d 1541 (Fed. Cir.1983) in support of its contention that the CDA does not cover claims by a subcontractor. That case involved a subcontract between a prime contractor (Turner Construction) and subcontractor, Johnson Controls, for the installation of a heating/cooling system in a National Health Institute facility being constructed by Turner pursuant to Turner's contract with the Department of Health, Education and Welfare.

While it is true that in *Johnson Controls* the court determined that the subcontractor's claims in that case were not subject to the CDA, the court acknowledged that "[o]ver the years, a number of exceptions have been recognized to the general rule that a subcontractor cannot bring a direct appeal against the government." *Id.* at 1553. The court then discussed these exceptions. Plaintiff here argues that the "express agency" exception (where the subcontractor acts as an agent for the government) discussed by the *Johnson Controls* court is not satisfied. However, Plaintiff makes no mention of the *Johnson* court's discussion of another exception—the "otherwise in privity" with the government exception.

With respect to that "otherwise in privity" exception, the court delineated four factors to be considered in determining whether the CDA would apply to a subcontractor's claims: (1) whether the subcontractor and the government had ever had a direct contractual relationship; (2) whether the subcontract with the prime contractor contained an "ABC" clause (i.e., an express disclaimer of privity of contract between the subcontractor and the government); (3) whether the prime contractor was required to obtain a Miller Act payment bond, thereby providing a recourse by the subcontractor other than a direct appeal; and (4) whether there was any provision in any of the contract documents that clearly authorized a direct appeal (to the Board of Contract Appeals) by the subcontractor. *Id.* at 1553.

In *Johnson Controls,* the court determined that these factors were not satisfied. The court found that the first factor was not satisfied because there was no evidence that the Johnson Controls/Turner subcontract was ever assigned to the government or that there had been other direct dealings between Johnson Controls and the government. Second, the court found that there was an express ABC disclaimer in the subcontract of privity with the government. Third, Turner, the prime contractor, was required to obtain a payment bond giving Johnson Controls, as subcontractor, a right to bring a judicial action on the bond against the prime contractor. Last, although the subcontract contained a dispute resolution provision (similar to the one at issue in this case), based on evidence presented to the court, the court found that the parties' intent with respect to the inclusion of the dispute clause was "informational only" and not intended to provide the subcontractor with a right of direct appeal. *Id.* at 1553–54.[16]

Particularly noteworthy, however, is the *Johnson Controls* court's discussion of the strong impact of a Disputes clause which is not contradicted by evidence establishing that the parties did not intend to provide a right of direct appeal:

If, as Johnson asserts, the purpose of the inclusion of the Disputes clause in the subcontract was to permit the presentation of subcontractor claims to the contracting officer with a right of appeal to a board of contract appeals, then a strong argument could be made that the parties intended to permit a direct appeal by Johnson rather than recourse to Turner, the prime contractor. Although the subcontract was executed by Turner and Johnson, it should be remembered that all subcontracts were subject to prior government approval. Also, it appears that not only was the government aware of the inclusion of the

Disputes clause in the subcontract, but also consented to its use.

713 F.2d at 1554.

The district court in this case discussed *Johnson Controls* and observed that, "the Federal Circuit Court of Appeals did not hold that there was jurisdiction in the federal courts for the subcontractor to initiate [an action] but, instead, held that *in circumstances such as were presented therein subcontractors had limits upon their direct access to the appeal process under the CDA*". [JA p. 598]. The court further found *Johnson Controls* factually distinguishable because "the articulated intent of the parties therein as regards privity, set forth in the contract, was that no contractual relationship existed between the government entity and the subcontractor, and that there was a complete absence of clear contractual consent for direct appeals by the subcontractors of determinations of contracting officers." *Id.*

RMI's claims in this action present precisely the opposite of the *Johnson Controls* facts on *each* factor. First, RMI had a *direct* contractual relationship with the government for over 25 years before WEMCO entered the scene. Moreover, before this suit was filed (indeed, before the Contracting Officer's decision was even rendered), RMI *agreed* to the assignment of the subcontract back to the Department of Energy under which WEMCO was "relieved" of all "responsibility" or further "obligation" thereunder. Thus, the "direct contractual relationship" factor of *Johnson Controls* is satisfied.

Second, the RMI subcontract contains an express Disputes clause which *expressly* authorized and directs RMI to bring its claims before the DOE contracting officer with a direct right of appeal to the Energy Board of Contract Appeals. As set forth above, even the *Johnson Controls* court observed that such a clause is "strong" evidence of CDA coverage of a subcontractor's claims.

**16.** The court reached this conclusion based on the affidavits of the individuals who negotiated the subcontract on behalf of Johnson Controls and Turner, and based upon its interpretation of a "Claims" clause in the principal contract between Turner and the Government which the

court determined required Turner to submit claims to the Board on behalf of subcontractors, thus, requiring Turner to "sponsor" subcontractor appeals (which negates a right of direct appeal by the subcontractor).

Third, there is no "ABC" disclaimer of privity with the DOE in the RMI/WEMCO subcontract.[17] Fourth, unlike *Johnson Controls*, WEMCO was not required to obtain a Miller Act payment bond for this subcontract.

The foregoing makes clear that even under *Johnson Controls*, by application of the parameters set forth in that case, RMI was "otherwise in privity" with the DOE as to its claims against the Westinghouse Defendants.

By application of the *Johnson Controls* factors, other courts have determined that the CDA applied to claims asserted by subcontractors against non-government prime contractors.

For example, the Energy Board of Contract Appeals and the Federal Circuit determined that the CDA applied to the claims of a subcontractor against a prime contractor in *Arntz Contracting Co.*, EBCA No. 187–12–81, 84–3 BCA (CCH) ¶ 17,604, 1984 WL 13945 (1984), *aff'd, Arntz Contracting Co. v. United States*, 769 F.2d 770 (Fed.Cir.1985). In that case, the University of California, which had a prime contract with the Department of Energy to operate the Lawrence Livermore National Laboratory, entered into a subcontract with Arntz Contracting Co. to construct a building at the Livermore facility to house a Magnetic Fusion Energy Computer Center. Arntz, itself, had no contract with the DOE. A dispute arose between Arntz and the University concerning materials and paint colors for the exterior walls of the building being built. As a result, Arntz's project time had to be extended by 506 days. Arntz claimed that the extended delay was caused by the University and that as a consequence, Arntz incurred substantial damages. Arntz subsequently filed a claim for damages against the University under the Contract Disputes Act.

Despite the University's and the Government's arguments in opposition, the Energy Board of Contract Appeals determined that the CDA applied to Arntz's claims against the University. In reaching its conclusion, the EBCA noted that in many circumstances, the CDA would not apply to claims of a subcontractor against a non-Government prime contractor. However, after examining the terms of the subcontract, the Board found that the DOE retained a degree of control over the project. It also found that most of the *Johnson Controls* factors were satisfied. Specifically, the Board noted that (1) there was no ABC clause in the subcontract; (2) there was no requirement that the prime contractor obtain a Miller Act bond; and (3) there was an express disputes resolution provision in the subcontract authorizing a direct CDA appeal by the subcontractor to the EBCA. Based on the foregoing, the EBCA concluded:

> The facts in this case establish that the relationship of Arntz to the Government under the subcontract was far closer than would be the case of the average subcontractor working through a prime contractor.... Accordingly, based on the acts of the parties and the circumstances of their relationship we find privity of contract between the DOE and Arntz.

> \* \* \* \* \* \*

> We conclude that since Arntz is in privity with the Government, it is, therefore, a "contractor" under Section 2(4) of the CDA. Accordingly, ... this Board possesses the necessary jurisdiction to hear and decide this appeal under the Act.

1984 WL 13945, pp. 10–11. The Federal Circuit subsequently affirmed the EBCA's CDA jurisdiction decision "on the basis of its thorough and well-reasoned opinion." 769 F.2d 770.

17. RMI argues that the Court should consider boiler plate language in the WEMCO *prime* contract with the Government which requires that all subcontracts be submitted to the DOE for approval and that "approval" of a subcontract, "shall not be construed to constitute approval of the subcontractor ... or [the] creation of any subcontractor privity of contract with the Government." This clause, however, does not disclaim privity, only that mere "approval" of a subcontract shall not create privity with the subcontractor. More importantly, the *Johnson Controls* ABC disclaimer ("ABC" setting forth the express language of the disclaimer that a (subcontractor) and b prime contractor are in privity; and b prime contractor and c government are in privity) was a provision in the Turner/Johnson *subcontract, not* only the Turner/Government prime contract.

Other EBCA and Federal Circuit decisions have also determined the issue of CDA preemption of claims asserted by subcontractors against non-government prime contractors by application of the four *Johnson Controls* factors. *See, L.O. Warner, Inc.,* EBCA Nos. 351-2-86 and 359-6-86, 86-3 BCA (CCH) ¶ 19,207, 1986 WL 20169 (1986) (sufficient indicia of privity between subcontractor and government to establish that CDA applied to subcontractor's claims against prime contractor where only three of the four *Johnson Controls* factors were present); *McMillin Bros. Constructors, Inc.,* EBCA No. 328-10-84, 86-3 BCA (CCH) ¶ 19,179 at 96,988-93, 1986 WL 20168 (1986), *aff'd, McMillin Bros. Constructors, Inc. v. Watkins,* 949 F.2d 403 (Fed.Cir.1991) (privity of contract with government and CDA jurisdiction over subcontractor's claims against prime contractor found "based on the acts of the parties and the circumstances of their relationship"); *General Coatings, Inc.,* EBCA No. 218-8-82 1983 WL 13333 (1983) ("ABC" clause in prime contract insufficient to defeat CDA jurisdiction over subcontractor's claims against prime contractor where other *Johnson Controls* factors satisfied).

In light of the facts and circumstances of this case, and by application of the foregoing authorities, we find that Plaintiff RMI's claims against the Westinghouse Defendants fall within the exclusive jurisdiction of the CDA. Hence, federal court jurisdiction over the claims does not exist.[18] Accordingly, we AFFIRM the district court's finding of CDA preemption of RMI's claims against the Westinghouse Defendants.

## C. *THE GOVERNMENT'S MOTION TO SUBSTITUTE/INTERVENE*

▮▮▮ RMI also challenges the district court's decision to grant the United States' motion to substitute in this action in the place of named Defendant Ray Hansen, a Department of Energy employee.

Under the Federal Employees Liability Reform and Tort Compensation Act of 1988, 28 U.S.C. § 2679 (the "Westfall Act"), the United States may be substituted in a civil action for money damages brought against a federal employee who is alleged to have committed a common law tort while acting within the scope of his or her employment. *Arbour v. Jenkins,* 903 F.2d 416, 420 (6th Cir.1990).

In Plaintiff's Complaint, Ray Hansen was described as being an "Acting Manager–Operations, within the DOE, and was formerly Deputy Manager, DOE Field Office, Fernald, where he had oversight responsibility on behalf of the DOE with respect to RMI's contractual relationship with WEMCO". Mr. Hansen was being sued both individually and in his capacity as "an officer, agent, representative or official, as the case may be, of

---

**18.** We are aware that a few other courts have addressed the issue of applicability of the CDA to disputes between subcontractors against non-government prime contractors and have determined that the CDA does not cover such claims. *See Riley Elec. Co. v. American Dist. Tel. Co.,* 715 F.Supp. 813 (W.D.Ky.1989); *Allied Sys. Co. v. Marinette Marine Corp.,* Civ. No. 95-268-FR, 1995 WL 434340 (D.Or.1995); *United States v. Miller-Stauch Constr. Co.,* 904 F.Supp. 1209 (D.Kan.1995). However, we find those cases to be distinguishable.

*Riley* involved a third-party complaint for indemnification. In that case, the DOE, which owned a nuclear energy plant, had a contract with Martin–Marietta Corporation for the operation of that plant. Martin–Marietta entered into a contract with ADT for the installation of a fire alarm system. ADT, in turn, subcontracted the fire alarm installation work to Riley Electric. Riley sued ADT for breach of contract and ADT filed a third-party complaint against Martin–Marietta for indemnification. It was in this third-party dispute—which was three times removed

from the DOE prime contract—that the court found no CDA preemption. There were no "otherwise in privity" factors present in that case. In fact, the court did not even mention *Johnson Controls* or any other "otherwise in privity" case. The *Allied Systems* decision was based entirely on the ruling in *Riley.* There is no discussion in that case of the statute or applicable case law. The court merely stated in a conclusory fashion that the CDA does not apply to disputes between contractors and subcontractors.

*Miller–Stauch* is also readily distinguishable. That case involved a Miller Act action on a surety bond. The Miller Act contains an independent *exclusive* grant of federal court jurisdiction. See 40 U.S.C. § 270b (b), which provides:

Every suit instituted under this section shall be brought in the name of the United States ... in the United States District Court for any district in which the contract was to be performed and executed **and not elsewhere**....

Clearly, under such an unambiguous statement of exclusive federal court jurisdiction, the CDA would have no preemptive force.

... the DOE." The claims which specifically name Mr. Hansen allege false representation, defamation, and interference with RMI's contractual relationship with WEMCO.

The Westfall Act provides in pertinent part as follows:

> Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant.

28 U.S.C. § 2679(d)(1).

The Attorney General has delegated to the United States Attorney the authority to provide the Section 2679(d) certification. 28 C.F.R. § 15.3 (1989). In this case, the U.S. Attorney for the Northern District of Ohio provided written certification that Ray Hansen was acting within the scope of his employment with the DOE in connection with the events underlying RMI's suit.

■■■■ The Attorney General's certification provides *prima facie* evidence that the employee was acting within the scope of employment. *Brown v. Armstrong,* 949 F.2d 1007, 1012 (8th Cir.1991). Whether an employee was acting within the scope of his employment is a question of law, not fact, made in accordance with the law of the state where the conduct occurred. *Henson v. National Aeronautics and Space Administration,* 14 F.3d 1143, 1147 (6th Cir.), *amended on reh'g,* 23 F.3d 990 (6th Cir.1994). Under Ohio law, an employee acts within the scope of employment if the employee acts within

his authority during the course of employment even though acting intentionally or maliciously. *Id. See also, Woods v. McGuire,* 954 F.2d 388 (6th Cir.1992).

■■■■ RMI argues in this appeal that the district court did not allow it sufficient opportunity to challenge the U.S. Attorney's certification that Hansen was acting within the scope of his employment. The gist of RMI's argument is that the district court should have allowed it to conduct discovery and to hold an evidentiary hearing so it could mount a challenge to the U.S. Attorney's certification.

The district court noted that RMI had over a year to come forward with evidence to challenge the certification during the pendency of final disposition on the motion for substitution, including having been given a one-month extension of time to file objections to the Magistrate Judge's Report and Recommendation. [JA p. 56.] [19] The scope of discovery is within the discretion of the district court's ruling and will not be disturbed on appeal unless an abuse of discretion is shown. *Woods v. McGuire, supra,* 954 F.2d at 391.

■■■■ The mere fact that a federal employee's actions may have been unlawful or in derogation of the plaintiff's contractual rights is not enough, by itself, to find that the employee's actions were outside his authority. *Henson, supra,* 14 F.3d at 1148. No hearing on certification is necessary where even if the plaintiff's assertions were true, the complaint allegations establish that the employee was acting within the scope of his/her employment. *Id.* Where, as here, a plaintiff in his complaint pleads conduct within an individual's scope of employment and merely alleges bad or personal motive, summary dismissal of the scope challenge is war-

---

**19.** Plaintiff argues that it could not have an opportunity to complete discovery because of the pendency of the Defendants' motion to stay discovery. However, RMI concedes that no stay was ever entered, and it does not appear from the record that Plaintiff ever argued that it needed to complete discovery to challenge the U.S. Attorney's certification of Defendant Hansen's employment.

Moreover, assuming the discovery the RMI sought to complete was to obtain answers to interrogatories and document production requests served upon Hansen, these discovery requests show that RMI was simply concerned about the DOE's knowledge about and documents retained concerning the DOE–WEMCO prime contract and RMI's subcontract with WEMCO. [See JA pp. 496–508.] Even if answers to these requests had been obtained, they would not have provided RMI with any information as to the scope of Hansen's employment.

ranted. *Brown v. Armstrong, supra,* 949 F.2d 1007 at 1012–13.

The scope of employment issue does not focus on the alleged wrongful nature of the employee's actions; rather, the issue is the actions complained of and whether those actions are "so divergent that [their] very character severs the relationship of employer and employee." *Osborne v. Lyles,* 63 Ohio St.3d 326, 330, 587 N.E.2d 825, 829 (1992).

In this case, RMI merely characterizes Hansen's actions in dealing with the WEM-CO subcontract as malicious and reckless. However, as set forth above, even intentional and malicious actions are within an employee's actions if the employee is acting within the course of employment and within his authority. *Woods v. McGuire, supra.*[20]

For all of the foregoing reasons, we find no abuse of discretion on the district court's part in refusing to permit RMI to complete discovery before granting the Government's motion to substitute in this action in place of Defendant Ray Hansen.

### IV.  CONCLUSION

For all of the reasons stated above, the district court's dismissal of this action is hereby AFFIRMED.

---

**20.** The cases relied upon by RMI all deal with sexual and racial harassment by supervisors of employee-plaintiffs (and one case involving the sexual activities of a priest with a parishioner). Not surprisingly, in these cases, the courts held that the employee-defendants were not acting within the scope of their employment. This is hardly the case here where all that is alleged is that Hansen reported (allegedly falsely) to DOE supervisors that RMI was not performing its work properly. This is no different than allegations that a plaintiff's supervisor falsely reported her absences from work and maliciously disciplined her. In *Arbour, supra,* this court observed that such conduct was within the federal employee-supervisor's scope of employment. (It was the allegation that the supervisor subsequently locked her in a garage that the court found to be an allegation which, if sufficiently proven, might rebut Westfall certification.)