LITTLE TRAVERSE BAY BANDS OF ODAWA INDIANS; Grand Traverse Band of Ottawa and Chippewa Indians; and Little River Band of Ottawa Indians, Plaintiffs,

v.

GREAT SPRING WATERS OF AMERICA, INC., a Subsidiary of the Perrier Group of America, Inc., a Delaware corporation, and John M. Engler, Governor of the State of Michigan, Defendants.

No. 1:02–CV–127.

United States District Court,
W.D. Michigan,
Southern Division.

May 28, 2002.

James A. Bransky, Traverse City, MI, for Little Traverse Bay Bands of Odawa Indians.

William Rastetter, Olson & Bzdok, PC, Traverse City, MI, for Grand Traverse Band of Ottawa and Chippewa Indians.

William J. Brooks, Maistee, MI, for Little River Band of Ottawa Indians.

John M. DeVries, Mika, Meyers, Beckett & Jones, PLC, Grand Rapids, MI, for Great Spring Waters of America, Inc.

Jeffrey V. Stuckey, Dickinson Wright, PLLC, Lansing, MI, John Wernet, Michigan Attorney General, Lansing, MI, for John Engler.

## OPINION

ENSLEN, District Judge.

"Whiskey is for drinkin', but water is for fightin'." Attributed to Mark Twain.[1]

This matter is before the Court on Defendant Great Spring Waters of America, Inc.'s Motion to Dismiss Plaintiffs' Complaint. Defendant John M. Engler is also named in the suit and has concurred in the Motion to Dismiss. The suit is brought by Plaintiffs Little Traverse Bay Bands of Odawa Indians, Grand Traverse Band of Ottawa and Chippewa Indians, and Little River Band of under the Water Resources Development Act of 1986, 42 U.S.C. §§ 1962d–20 ("WRDA") to enjoin the exportation of waters from the Great Lakes and Great Lakes tributaries.[2]

### FACTS

Since this controversy is raised by Motion to Dismiss, most of the pertinent facts are contained in Plaintiffs' Complaint. Plaintiffs allege that they have court-recognized property rights to use and fish in certain waters of Lake Michigan and its tributaries and that these rights derive in part from the 1836 Treaty of Washington. (Plaintiffs' Complaint at ¶¶ 6–11.) Plaintiffs further allege that Defendant Great Spring Waters of America, Inc.'s ("GSWA") parent company, the Perrier Group of America, Inc. ("Perrier"), has acquired title to real property in Mecosta County, Michigan, including water rights to the Sanctuary Springs in that county. (Id. at ¶ 114.) The aquifer supplying this Spring also supplies Osprey Lake, which in turn flows into a stream which flows into the Muskegon River and Little Muskegon River watersheds, which Rivers are tributaries of Lake Michigan. (Id. at ¶ 20.)

According to Plaintiffs, GSWA has been licensed by the Michigan Department of Environmental Quality ("MDEQ"), which is under the authority of Defendant Engler, to pump 400 gallons per minute of water from the Spring for diversion to its bottling plant in Mecosta County. (Id. at ¶ 14–17.) Further, according to the Complaint, GSWA intends to sell a percentage of the water bottled outside the Great Lakes states. (Id. at ¶ 21.) According to the Complaint, this diversion of water outside the Great Lakes has not been formally approved by each of the Governors of the Great Lakes states since Defendant Engler determined that it was unnecessary to seek the permission of other Great Lakes Governors in connection with this project. (Id. at ¶ 33–35.) According to the Complaint, this determination by Governor Engler was made despite the advice of the Michigan Attorney General Jennifer Granholm and United States Senator Carl

---

1. Quotation was found at www.twainquotes.com as of May 17, 2002. It was noted therein that the attribution was made in the August 9, 1883 edition of Life Magazine and could not be verified. Suffice it to say, even if Twain did not say as much, he should have.

2. Plaintiffs have sued under the WRDA's provisions. While they have noted their treaty rights as a basis for standing, they have not sued to directly enforce their treaty rights. Presumably the reason for this election is that the exportation of waters has not, yet, had any discernable effect on Plaintiffs' exercise of their treaty rights.

Levin that this project falls within the WRDA proscription against water exportation. (*See id.*)

. In answer. to the Complaint, Defendant Engler has admitted that the MDEQ has granted licenses to GSWA for wells on the Sanctuary Springs site and that the licenses allow pumping of up to 400 gallons per minute, and that two wells (each with a maximum capacity of 200 gallons per minute) are now operational at the site. (Answer at ¶ 15.) Defendant Engler admits that the Spring aquifer flows into Osprey Lake, which flows into a stream which connects with the Little Muskegon River and Muskegon River watersheds, which rivers are tributaries of Lake Michigan. (*Id.* at ¶ 20.) Defendant Engler admits that the pumping activities are likely to reduce the flow of waters to Lake Michigan. (*Id.* at ¶ 22.) However, he denies that the reduced flow has any "legal, practical or environmental significance" and further denies that such will cause a "diversion" of Great Lakes waters. (*Id.* ·at ¶ 22–25.)

Evidentiary materials filed by the parties include the following: the Affidavit of James M. Olson; Defendant GSWA's Answers to Plaintiffs' First Interrogatories and Third Request to Produce Documents; Depositions of Rodney Allen and Brendan O'Rourke (employees of GSWA); the Affidavit of Jane Ten Eyck (the Assistant Executive Director of the Chippewa Ottawa Resource Authority); and the Affidavit of Dr. David Hyndman, Associate Professor of Geological Sciences at Michigan State University. Jane Ten Eyck's Affidavit establishes that Congress has appropriated funding on a yearly basis between 1992–2002 in connection with Plaintiffs' exercise of fishing rights under the 1836 Treaty. The Olson Affidavit and the Allen and O'Rouke Depositions evidence that there is a high probability that the bottled waters will be shipped, at least in part, to areas outside the Great Lakes, including the States of Iowa and Kentucky. (*See* GSWA Answers at 27; Allen Dep. at 154; O'Rourke Dep. at 76–77.) Dr. Hyndman's Affidavit establishes that the licensed pumping activities are unlikely to result in a measurable drop of the water levels of the Great Lakes, Little Muskegon River or the Muskegon River. (Hyndman Affidavit at 126.)

## LEGAL STANDARDS

Defendant GSWA has moved for dismissal under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). Defendant GSWA has identified its legal challenge to subject matter jurisdiction as a facial attack on the pleadings. (Defendant's Brief in Support, at 2.) Thus, the pertinent standards for review are those identified in *RMI Titanium Co. v. Westinghouse Electric Corp.*, 78 F.3d 1125, 1134–35 (6th Cir. 1996) for facial attacks as to subject matter jurisdiction: namely, the district court must assume that Plaintiffs' allegations are true and must construe them in a light most favorable to Plaintiffs. *Id.* Relief is appropriate only if, after such construction, it is apparent to the district court that there is an absence of subject matter jurisdiction. *Id.See also United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir.1994) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 235–37, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). The standard under Rule 12(b)(6) is essentially the same, except the focus is on the viability of the alleged cause of action instead of the presence or absence of federal jurisdiction. *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Gregory v. Shelby County*, 220 F.3d 433, 446 (6th Cir.2000); *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir.1988).

While it is true that a Rule 12(b)(6) motion which raises matters outside the pleadings ought to be considered under the summary judgment standards of Rule 56, *see* Rule 12(b), this requirement is irrelevant in cases when the motion turns on a legal decision which does not depend upon the factual matters raised. Herein, the legal question of whether the WRDA implies a private right of action to enjoin exportation of Great Lakes waters does not depend on any analysis of the matters raised outside the pleadings described above.

## LEGAL ANALYSIS

### a. Statutory Language and History

This case raises the issue of whether a provision of the WRDA, heretofore not interpreted by any published federal decision, creates a private right of action to enjoin the diversion or exportation of Great Lakes waters outside the Great Lakes basin. The provision reads as follows:

> No water shall be diverted or exported from any portion of the Great Lakes within the United States, or from any tributary within the United States of any of the Great Lakes, for use outside the Great Lakes basin unless such diversion or export is approved by the Governors of each of the Great Lake[s] States.

42 U.S.C. § 1962d–20(d). The wording of this proscription is the product of both its original enactment on November 16, 1986 and its subsequent amendment on December 11, 2000. This provision of the WRDA contains no *de minimus* exception nor exception for reasonable use—such that, by it terms, it is violated when a person fetches a drinking cup of water from the Muskegon River and sells it for consumption in the State of Kentucky without first obtaining the consent of all eight Great Lakes Governors.

It is admitted in the briefing, and is a matter of public record, that the WRDA contains no language creating an express right of action on behalf of anyone to enforce this provision of the WRDA. Likewise, it is clear from the briefing and public record that the WRDA contains no criminal penalties for a violation of this provision. It is also admitted in the briefing, and is a matter of public record, that the legislative history pertinent to the enactment of this provision of the WRDA is relatively silent as to the means for enforcement of this provision. *See* H.R.Conf. Rep. No. 1013, 99th Cong., 2nd Sess.1986, 1986 U.S.C.C.A.N. 6723 (1986); H.R.Conf. Rep. No. 1020, 106th Cong., 2nd Sess.2000, 2000 WL 1642756 (Oct. 31, 2000); *see also* 132 Cong.Rec.S. 2379–02 (comments of Senator Metzenbaum) (March 14, 1986).

■ However, it is also noteworthy that the non-codified resolution language of the 2000 Public Law which amended the WRDA states that:

> It is the sense of Congress that the Secretary of State should work with the Canadian Government to encourage and support the Provinces in the development and implementation of a mechanism and standard concerning the withdrawal and use of water from the Great Lakes basin consistent with those mechanisms and standards developed by the Great Lakes States.[3]

P.L. 106–541, 114 Stat. 2572 at § 504(c) (Dec. 11, 2000). This language would appear to endorse enforcement through the mechanisms designed by the Governors of

---

**3.** Provisions of public laws couched in the "sense of Congress" language are non-binding, but are nevertheless a good indicator of the intent of Congress in enacting legislation. *See Yang v. California Dept. of Social Services,* 183 F.3d 953, 958 (9th Cir.1999); *United States v. Amer,* 110 F.3d 873, 882 (2nd Cir. 1997); *Trojan Technologies, Inc. v. Pennsylvania,* 916 F.2d 903, 909 (3rd Cir.1990).

the Great Lakes States, especially as to disputes with Canada. It is also significant to note that another provision of the WRDA enacted in 2000 contains express language creating a private right of action as to another water project, the Everglades Restoration Plan. *See, e.g.,* P.L. 106–541, 114 Stat. 2572 at § 601(h).

Given that Plaintiffs assert their standing based upon their statuses as riparians, users and treaty rights-holders, the exact legal question here is whether such persons may sue to enjoin a diversion or exportation of Great Lakes waters when the Governors of the Great Lake States fail to act.

Under the WRDA, the Great Lakes States mean "Illinois, Indiana, Michigan, Minnesota, Ohio, Pennsylvania, New York and Wisconsin." 42 U.S.C. § 1962d–20(c). Also, the WRDA, which was enacted in 1986 and amended in 2000, does not by its terms apply to any diversions of Great Lakes waters "authorized on November 17, 1986." 42 U.S.C. § 1962d–20(f).

Congress' finding, declarations and policy concerning the WRDA are stated in subsections (a) and (b) of section 1962d–20. Generally, Congress has found and declared that the Great Lakes are an important resource to the Great Lakes States and the two Canadian Provinces surrounding the Great Lakes, that new diversions are likely to have significant economic and environmental impacts, and that such diversions should not occur without the express consent of the Governors of the Great Lakes States. *See* 42 U.S.C. § 1962d–20(a)–(b). The Congressional statement of policy was amended in 2000 to state the additional policy of "encourag[ing] the Great Lakes States, in consultation with the Provinces of Ontario and Quebec, to develop and implement a mechanism that provides a common conservation standard embodying the principles of water conservation and resource improve-

ment for making decisions concerning the withdrawal and use of water from the Great Lakes basin[.]" 42 U.S.C.1962–20(b)(2). At the same time, the prohibition in subsection (d) was clarified so as to expressly include not only any diversion, but also any exportation of Great Lakes water outside the Great Lakes basin.

Although the language of the WRDA itself is fairly opaque, its purposes are clear in the context of the very public governmental consultations which have coincided with its enactment and amendment. As mentioned in the WRDA, one of its precursors was the Boundary Waters Treaty of 1909 between Great Britain (acting for the Dominion of Canada) and the United States. Said Treaty established an International Joint Commission with jurisdiction over water diversions between the United States and Canada, especially including those affecting the Great Lakes.

Another important precursor for the Act has been the very public Great Lakes dispute concerning the diversion of Great Lakes waters by the City of Chicago to accommodate its water supply, navigation and sewage. This diversion began in the mid–19th Century and became the subject of litigation in the early 20th century. *See Sanitary District of Chicago v. United States,* 266 U.S. 405, 45 S.Ct. 176, 69 L.Ed. 352 (1925); *Wisconsin v. Illinois,* 278 U.S. 367, 49 S.Ct. 163, 73 L.Ed. 426 (1929); *Wisconsin v. Illinois,* 388 U.S. 426, 87 S.Ct. 1774, 18 L.Ed.2d 1290 (1967); *Wisconsin v. Illinois,* 449 U.S. 48, 101 S.Ct. 557, 66 L.Ed.2d 253 (1980). The Consent Decree entered by the Supreme Court allows for a continued and significant diversion of waters from Lake Michigan. The historical notes to the WRDA, 42 U.S.C.A. § 1962d–20, as to both its 1986 enactment and its 2000 amendment note that Congress has continued to fund ongoing studies of this diversion to determine whether

limitations of the diversion made by the Supreme Court's Consent Decree are respected. *See* 42 U.S.C.A. § 1962d–20, historical notes (West 2001).

Another precursor to the enactment of the WRDA was the prior enactment of the Great Lakes Charter. In the early 1980's, there was a concern among the Great Lakes States caused by a proposal by the Army Corps of Engineers to divert water from Lake Superior through the Mississippi River for use in the High Plains, as well as other proposed projects for use of Great Lakes waters. *See* James M. Olson, *Great Lakes Water*, 80–Dec. Mich.B.J. 33, 33–34 (2001); Chris Shafer, *Great Lakes Diversions Revisited*, 17 T.M. Cooley L.Rev. 461, 463 (2000). These concerns translated into the enactment of the Great Lakes Charter in 1985. The Charter is a kind of gentleman's agreement between the Governors of the Great Lakes States and the Provincial Premiers of Ontario and Quebec that the parties to the Charter should not make any new diversion of Great Lakes waters averaging more than 5 million gallons per day over a 30–day period without the notification, consultation and approval of all parties to the Charter. *See* Great Lakes Charter (Principles for the Management of the Great Lakes Water Resources) (Feb. 11, 1985) (available at www.cglg.org/pub/charter).

Congress' enactment of the WRDA then followed the adoption of the Charter in 1986. The WRDA, unlike the Charter, contains no quantity requirement for triggering a need for member approval.

In 2000, the WRDA was amended, as noted above, to broaden its terms so as to apply to "exports" as well as "diversions" and to recognize the need for the Great Lakes States and Provinces to consult to develop a conservation standard pertinent to WRDA decisions. According to the remarks of Representative Bart Stupak of Michigan, this amendment was prompted by concerns about exporting Great Lakes water to Asia, but the amendment language did not goes as far as he or others might have liked:

Mr. Stupak:

Mr. Speaker, I am grateful that the Senate has recognized the need to protect the Great Lakes water from diversion and export. Yesterday, the other body passed legislation that focuses on protecting this precious resource from foreign companies and countries who target the Great Lakes for their fresh, drinking water.

The Great Lakes is the largest body of fresh water, containing more than 20 percent of the planet's fresh water, and is the primary source of drinking water for millions of people. These lakes, however, are being targeted outside the continent because the global water demand is doubling every 21 years. The World Bank predicts that by the year 2025, more than 3 billion people in 52 countries will suffer water shortages for drinking or sanitation.

Unfortunately, this legislation does not go far enough to ensure a federal role in protecting the Great Lakes from such threats. The language passed by the Senate is nonbinding and thus does not ensure a role for the Secretary of State or any other federal official or agency in devising and approving water conservation standards for the region.

Despite opposing arguments, water diversion from the Great Lakes must involve the federal government. Notably, only the federal government may enter into treaties with the Canadian government. Only the federal government may devise a uniform national policy on diversions. And, only the federal government may set and enforce policies on international waters that apply to four of the five Great Lakes. The federal gov-

ernment's role in this issue is clearly delineated and it must maintain a strong involvement to prevent future diversions.

This entire issue was spurred in 1998 when a Canadian company planned to ship 3 billion liters of water from Lake Superior over 5 years and sell it to Asia. That same year I authored legislation, that the House of Representatives passed, urging the United States government to oppose this action. While the permit was subsequently withdrawn, the House passage of my resolution could not stop future requests. In fact, the United States cannot stop diversions and withdrawals in Great Lakes water that is under the control of Canada....

146 Cong.Rec. at H11816–03, H11828 (Nov. 3, 2000). In the Senate, there were also similar comments, especially by Senator Levin, to the effect that there may be a need for future Congressional legislation on this subject, particularly to review as-of-yet, unseen conservation standards. *See* 146 Cong.Rec. at S11405–01, S11406 (Oct. 31, 2000).

During the passage of the 2000 amendment of the WRDA, Michigan's senators Carl Levin and Spencer Abraham also noted their disagreement about how the "export" language in the amended language should be worded. Senator Abraham conceded the issue to Senator Levin and the bill was passed without any reference to "bulk fresh water" transfers. The comments they made in relation to this issue bear on Congress' intent as to enforcement of the WRDA:

Mr. Abraham:

Madam President, I rise today to offer my thanks to Senator SMITH, the chairman of the Environment Committee and commend him for his successful effort to pass the Water Resources Development Act of 2000.

Included in this legislation is language I crafted with Representatives EHLERS and CAMP to further clarify the extent of the Great Lakes Governors' authority over diversions of Great Lakes water to locations outside the basin. This amendment makes clear that both diversions of water for use within the U.S. and exports of water to locations outside the U.S. may occur only with the consent of all eight Great Lakes governors. Questions over the definition of "diversion" made this clarification necessary. Almost as important, this amendment demonstrates that it is the intent of the Congress that the states work cooperatively with the Provinces of Ontario and Quebec to develop common standards for conservation of Great Lakes water and mechanisms for withdrawals. Such cooperation is crucial if we are to have equal and effective programs for conserving these waters and maintaining the health of the Great Lakes.

In closing, let me state that I regret that my colleague, the senior Senator from Michigan did not join me in this effort. We share differing opinions over the need for clarification of the 1986 act. And while I disagreed with his interpretation of the definition of "bulk fresh water," because diversions of water for use within the U.S. are already distinctly covered in the 1986 act, I nevertheless modified the amendment at his request, and I share his commitment to protecting the tremendous resources for future generations.

146 Cong.Rec. S9142–01, at S9149–S9150 (September 25, 2000).

Mr. Levin:

I still have reservations about the amendment because some might try to use it to argue that the current protections against diversions of Great Lakes water provided by existing law are not

sufficient. We currently have an effective veto over bulk removals of Great Lakes water outside of the Great Lakes basin. When we passed WRDA in 1986, we acted to make sure that each Great Lakes governor would have a veto over such removals. This protection is legally sufficient and we should do nothing to imply otherwise.

If the states formally adopt a conservation strategy and standards, and the governors are currently working on those standards, such standards might provide an additional safeguard to strengthen our position that our current gubernatorial veto policy over bulk removals of Great Lakes water is consistent with the rules of international trade. This conservation strategy and standards might also provide additional protection against removals from the basin. But I favor seeking that additional strength for our position in a way which has no possible implication that it is necessary. While this amendment falls short in this regard, once offered, it would be worse if it were not adopted so I will not object to it.

146 Cong.Rec. S9142–01, at S9151–S9152 (Sept. 25, 2000).

Following the 2000 amendment of the WRDA, the Great Lakes Governors and Premiers gathered at Niagara Falls to approve "the Great Lakes Charter Annex, a Supplementary Agreement to the Great Lakes Charter" ("Annex 2001") on June 18, 2001. *See* Annex 2001 (available at www.cglg.org/projects/water/Annex2001.pdf). Annex 2001 is a supplemental agreement binding the Governors and Premiers to come to terms on conservation standards, collective management and dispute resolution within three years of its signing. Among other things, Directive 4 of the Annex establishes an "interim" decision making authority to make decisions under the WRDA pending ratification of a new agreement. Directive 6 of the Annex

also promises to "identify and implement effective mechanisms for decision making and dispute resolution." At the same time that Annex 2001 was approved, the Governors also approved a resolution, specifically directed at interim WRDA decisions, which stated their intent to make WRDA decisions utilizing the Charter consultation procedures and to utilize conservation principles stated in the resolution. *See* Resolution: Review of Proposals Subject to the Water Resources Development Act of 1986, § 1109, 42 U.S.C. § 1962D–20 (1986) (*amended* 2000) (June 18, 2001) (available at www.cglg.org/projects/water/WRDAResolution.pdf).

It is noted that Michigan already has some enforcement mechanisms in place for dealing with violations of the WRDA. Under Michigan Compiled Laws section 324.32713, the Attorney General may, upon the request of the Michigan Department of Environmental Quality (MDEQ), file suit in state circuit court to obtain an injunction of a diversion or exportation of Great Lakes waters. Presumably this was not done in this case because the MDEQ, which licensed this project, did not request action by the Attorney General.

### Legal Standards for Determining an Implied Cause of Action

■ In the case of *Cort v. Ash,* 422 U.S. 66, 76, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), the United States Supreme Court held that a shareholder could not sue for an injunction to enforce the Federal Elections Campaign Act Amendments of 1974. In doing so, the Supreme Court created a four-factor test for determining whether a federal court may imply a cause of action under a federal statute, namely:

In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. First, is the plaintiff 'one of the class for whose especial benefit the stat-

ute was enacted,' *Texas & Pacific R. Co. v. Rigsby,* 241 U.S. 33, 39, 36 S.Ct. 482, 484, 60 L.Ed. 874 (1916) (emphasis supplied)—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? *See, e.g., National Railroad Passenger Corp. v. National Assn. of Railroad Passengers,* 414 U.S. 453, 458, 460, 94 S.Ct. 690, 693, 694, 38 L.Ed.2d 646 (1974) (*Amtrak*). Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? *See, e.g., Amtrak, supra; Securities Investor Protection Corp. v. Barbour,* 421 U.S. 412, 423, 95 S.Ct. 1733, 1740, 44 L.Ed.2d 263 (1975); *Calhoon v. Harvey,* 379 U.S. 134, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964). And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law? *See Wheeldin v. Wheeler,* 373 U.S. 647, 652, 83 S.Ct. 1441, 1445, 10 L.Ed.2d 605 (1963); cf. *J.I. Case Co. v. Borak,* 377 U.S. 426, 434, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964); *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388, 394–395, 91 S.Ct. 1999, 2003–2004, 29 L.Ed.2d 619 (1971); *id.,* at 400, 91 S.Ct., at 2006 (Harlan, J., concurring in judgment).

*Id.* at 78, 95 S.Ct. 2080.

These same standards have been constantly reiterated and repeated in the case law of the United States Supreme Court and the Sixth Circuit Court of Appeals since the *Cort* decision. Although the Supreme Court's recent decision *Alexander*

*v. Sandoval,* 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001), and the Sixth Circuit's decision in *Parry v. Mohawk Motors,* 236 F.3d 299, 308 (6th Cir.2000), place greater emphasis on the first two of the *Cort* factors, all of the *Cort* factors remain relevant.[4] However, as noted in the recent case law of both the Supreme Court and the Sixth Circuit Court of Appeals, the federal courts "will not infer the existence of a private rights of action haphazardly," and will pay close attention to whether there is "affirmative evidence of congressional intent in the language and purpose of the statute or in its legislative history." *Pertuso v. Ford Motor Credit Co.,* 233 F.3d 417, 421 (6th Cir.2000) (citing *Touche Ross & Co. v. Redington,* 442 U.S. 560, 575, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979) and *TCG Detroit v. City of Dearborn,* 206 F.3d 618, 623 (6th Cir.2000)). "Congressional intent" is the "touchstone." *Id.*

### Illustrative Precedents

Both sides to this controversy have cited federal cases discussing implied causes of action under federal statute. Several cases cited, as well as some other federal cases, illustrate the decision making process pertinent to implying a cause of action under a federal statute.

In *California v. Sierra Club,* 451 U.S. 287, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981), the Supreme Court asked whether there was an implied cause of action under section 10 of the Rivers and Harbors Appropriation Act of 1899, which prohibited any obstruction to the navigable capacity of the waters of the United States. The Act provided no express private remedy, gave authority over obstructions to the Secretary of the Army, and contained criminal penalties for violation of the prohibition.

---

4. As correctly noted by Plaintiffs, had the Supreme Court intended to modify the *Cort* analysis in *Sandoval,* it could have clearly said as much. The fact that it has not done so shows that the *Sandoval* decision meant to emphasize the first factor, not exclude other factors.

In considering this Act, the Supreme Court determined that the Act was intended to benefit the public at large as opposed to any specific class of the public. *Id.* at 294, 101 S.Ct. 1775. It further concluded that, given the presence of criminal penalties and the intent of Congress to allow enforcement by the Secretary of the Army, no private cause of action should be implied. As noted by Plaintiffs, the *Sierra Club* case is somewhat distinguishable from the present case in that no criminal penalties were included in the WRDA. With this said, however, the *Sierra Club* precedent is more pertinent than the other cases cited by Plaintiffs—which cases generally involved enforcement of specific legislative language intended to protect specific groups, such as workers facing racial discrimination, *et cetera.* *Cf. Alexander v. Sandoval,* 532 U.S. 275, 288, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) (recognizing private cause of action as to § 601 of Title VI of the Civil Rights Act of 1964).

In *Sierra Club v. United States Army Corps of Engineers,* 701 F.2d 1011, 1033 (2nd Cir.1983), the Second Circuit Court of Appeals followed the Supreme Court's lead in the *Sierra Club* decision. It held that section 9 of the Rivers and Harbors Act, which prohibited the construction of dikes in navigable waters absent the prior approval of the Corps Chief of Engineers and the Secretary of the Army and the consent of Congress, did not create a private right of action.

In *New Jersey Dept. of Environmental Protection and Energy v. Long Island Power Authority,* 30 F.3d 403, 421–22 (3rd Cir.1994), the Third Circuit considered whether the Coastal Zone Management Act, which contains licensing procedures for the shipment of nuclear materials, provided the State of New Jersey with a private cause of action against a private company who allegedly was improperly licensed by the federal government. The Third Circuit said that the Act did not display an intent to create such a right of action in favor of a state, did not create a specific and pervasive federal scheme, and assigned licensing powers to federal agencies and not to the state governments. *Id.* at 422–23. *See also New York v. DeLyser,* 759 F.Supp. 982 (W.D.N.Y.1991) (holding that CZMA does not imply a right of action against private decision makers).

In *DiLaura v. Power Authority of State of New York,* 786 F.Supp. 241 (W.D.N.Y. 1991), the United States District Court for the Western District of New York considered the question of whether the Federal Power Act permitted a private cause of action in favor of injured riparians for damages and to enjoin a state utility from operating a power plant on the Niagra River. The District Court, applying the *Cort* analysis, determined that the statute in question contemplated only a suit for tort damages in state court and was silent as to whether a federal action was permitted. In light of this situation, and in light of the fact that damage to riparians is usually determined under state law, the District Court concluded that Congress did not intend to create a federal cause of action.

Plaintiffs cite in favor of their position the case of *Oneida Indian Nation v. County of Oneida,* 719 F.2d 525, 537 (2nd Cir.1983). In *Oneida,* the Second Circuit construed the Trade and Intercourse Act of 1793, which forbade white settlers from dispossessing lands of the Oneida Indians. It held that the Act created a private cause of action in favor of the dispossessed Indian Nation in addition to a federal common law right of recovery. Applying the *Cort* factors, the Second Circuit held that Act clearly intended to benefit unfairly disposed Indians; that, although the Act was silent as to whether a private cause of action was intended, this was the best and

most protective reading of the Act in light of the tragic history of government non-enforcement; that a private cause of action was necessary to fulfill the purposes of the Act in preventing unfair disposition of Indian property; and that relations with a sovereign tribe was principally a matter of federal and not state law. *Id.* at 533–36.

Although the above points were well and truly made in the *Oneida* case, it is significant to note several distinctions between the present legislation and that involved in the *Oneida* case. In the *Oneida* case, the legislation was specifically intended to protect Indian interests in property bestowed them by the federal government and a private cause of action was implied as necessary to protect those interests in light of a history of government non-enforcement. In this case, the legislation in question was directed at benefitting the public at large, including riparians and users of Great Lakes waters, regardless of whether those persons acquired claims by purchase, Treaty or otherwise. There is simply no expressed intent to specifically benefit tribal members as part of this provision. There is also no long history of non-enforcement of the provisions of this Act which necessitates the exercise of federal jurisdiction.

### *Analysis of Cort Factors*

#### 1. Class of Special Beneficiaries

■ First of all, the *Cort* test asks whether Plaintiffs are members of a special class which was intended to be benefitted by the Act. Plaintiffs are riparians, users and property owners by virtue of Treaty rights. However, there is no indication in the statute that any special benefits were intended to be conveyed upon any limited class of riparians, users or property owners such as Plaintiffs. Rather, the Act in its wording and history describes a general and public right which inures to all persons who live by, use and enjoy the waters of Lake Michigan. This public right extends to persons who use the resources only for recreation and/or only occasionally. As such, this right extends not to any limited class of persons, but rather to the public in general. As such, like the *Sierra Club* case, this is not a case in which Plaintiffs were intended a special benefit. Furthermore, while it may be true that Congress intended the Governors to have a cause of action to enforce compliance by member Governors, this argument detracts from, rather than supports, Plaintiffs' argument that they were intended to have a special benefit under the Act. Finally, Plaintiffs' tribal rights, although significant in other respects, are not significant to this analysis because Congress did not draft this prohibition to convey any special rights or protections upon tribal members.

#### 2. Indication of Explicit or Implicit Cause of Action

It is admitted that there is no explicit indication that a private cause of action was intended. As for an implicit private cause of action, all of the indications are that no such cause of action was intended. The language of the statute and legislative history is couched in light of the history of and deference to the Great Lakes Governors. The Act intended that the Governors have authority to make decisions jointly to protect the resource and enforce the prohibition, and the Act assumes, perhaps not wisely, that the Governors will act in favor of the interests of their citizens, including property holders. It is also apparent that enforcement of the prohibitions by private citizens was not contemplated because: this might frustrate the ability of the Governors to resolve issues utilizing uniform conservation principles; the Act is so non-specific that it has failed to provide sufficient criteria for judicial enforcement; the failure to include "private right of action" language as to this

section of the WRDA appears intentional in that said language is included as to another recent provision of the WRDA; and, Congress at the times of enactment understood that the Governors were embarking on a long-term project to negotiate terms pertinent to enforcement, including conservation standards and dispute resolution terms, which process is still developing. Based on these reasons and the whole of the statutory language and legislative history, the Court concludes that Congress did not intend a private cause of action.

With this said, it is important to comment on three potential problems of this legislative scheme. One problem, posed here, is what is to be done when the Governors elect, as they have apparently done in this case, to ignore the statutory proscription.[5] This problem is especially dire when the decision strikes at the interests of a disadvantaged minority, whether it be property owners or Indian tribes. While it must be admitted that this is a significant and potentially terrible problem, it is also a problem that the Act appears to overlook for the present in the hopes that later legislation or dispute resolution mechanisms will resolve it. While this problem cannot be gainsaid, the solution to this problem is not to try to enforce a vague statute, especially where the sense of Congress is that precise conversation standards and dispute resolution mechanisms must await further political negotiation. It is hoped that these mechanisms will include mechanisms to address citizen concerns and especially those of disadvantaged minorities, including Indian tribes.

Another potential problem with the Act is the absence of an explicit enforcement mechanism for the Governors to utilize to supervise a wayward Governor (or Premi-

er of the two relevant Provinces of Canada). Although this is not a slight problem, as proven by the history of the *Illinois v. Wisconsin* suit, it appears that the negotiations over Annex 2001 are directed at finding dispute resolution mechanisms to solve such a problem and that, in any event, the States could air their disputes over enforcement before the Supreme Court as was done in the *Illinois v. Wisconsin* suit.

Another potential problem is that the Governors might elect to enforce or not enforce the proscription of the Act in a manner which served their interests, but was contrary to the federal interests in the Great Lakes waters. The Court assumes without deciding that in such a case that officers of the federal government could bring suit to enforce the Act, but that federal enforcement might well be difficult especially in the absence of governing federal standards and in the absence of a Congressional delegation of authority to an officer of the executive branch.

### 3. Consistency with Statutory Scheme

As noted above, the third factor asks whether an implied private cause of action is consistent with the statutory scheme. This Court finds that an implied private cause of action would be inconsistent with the statutory scheme. The statutory scheme was intended to endorse decision making by the Governors and place authority as to these decisions in the hands of the Governors. The use of multiple lawsuits by a large number of disgruntled individual users and riparians would only complicate and frustrate the intended statutory scheme.

---

**5.** According to Defendants, the Governors were consulted and determined that formal notification and consultation were not re-

quired. (*See* Defendants' Reply at 8, n. 8; *see also* Plaintiffs' Complaint, Exhibit 5.)

### 4. Nature of the Governed Interest

Plaintiffs contend that this interest is a federal, as opposed to a state interest, and that this factor favors private federal enforcement. Plaintiffs make this argument based on the federal interests in regulating Indian affairs. This Court does not believe that the interests here are federal because of tribal rights. The tribal rights at issue are fairly peripheral to the federal statute and its enforcement scheme. Nevertheless, the Court does agree that there are important federal interests driving this legislation. The waters of the Great Lakes are navigable waters of the United States used to ferry goods between the States. The waters also occupy a huge and important source of fresh water for the United States, which is critical to interstate commerce. These interests are paramount to the state interests in regulation and cause this Court to conclude that interests in enforcement are primarily federal.

Upon assessing all of these factors, the Court concludes that the factors as a whole disfavor the creation of a private and implied cause of action under 42 U.S.C. § 1962d–20. Therefore, the Court determines both that it lacks subject matter jurisdiction over this suit and that the suit should be dismissed for failure to state a cause of action.

### CONCLUSION

For the reasons stated, a Judgment of Dismissal shall enter dismissing this suit pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6).

### JUDGMENT

In accordance with the Opinion of this date;

IT IS HEREBY ORDERED that Defendant Great Spring Waters of America, Inc.'s Motion to Dismiss Plaintiffs' Complaint (Dkt. No. 7) and Defendant John M. Engler's Joinder and Concurrence (Dkt. No. 14) are **GRANTED** and that this suit is **DISMISSED** pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6).